**Exhibit 14**

```
                                                          Page 1
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3   MICHAEL PARISH, et al.,        )
                                    )
 4              Plaintiffs,         )
                                    )
 5       vs.                        ) No. 07 CV 4369
                                    ) (Judge Kennelly)
 6   SHERIFF of COOK COUNTY and     )
     COOK COUNTY,                   )
 7                                  )
                Defendants.         )
 8
 9           The deposition of AVERY SCOTT HART, MD,
10   FACP, called by the plaintiffs for examination
11   pursuant to notice and pursuant to the Rules of Civil
12   Procedure for the United States District Courts
13   pertaining to the taking of depositions, taken before
14   CLAUDIA LEMON, License No. 084-001374, within and for
15   the County of Cook and State of Illinois, at Suite
16   1400, 2650 South California, Chicago, Illinois, on
17   May 10, 2011.
18
19
20
21
22
23
24
```

```
 1        APPEARANCES:
 2              LAW OFFICES OF KENNETH N. FLAXMAN, PC, by
                MR. KENNETH N. FLAXMAN
 3              200 South Michigan Avenue
                Suite 1240
 4              Chicago, Illinois  60604
                (312) 427-3200
 5                  On behalf of the Plaintiffs;
 6              THOMAS MORRISSEY, Ltd., by
                MR. THOMAS G. MORRISSEY
 7              10249 South Western Avenue
                Chicago, Illinois  60643
 8              (773) 233-7900
                    On behalf of the Plaintiffs;
 9
                COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
10              MR. FRANCIS J. CATANIA
                Assistant State's Attorney
11              RICHARD J. DALEY CENTER
                50 West Washington Boulevard
12              Chicago, Illinois  60602
                (312) 603-6572
13                  On behalf of the Defendants.
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                    Page 3
 1                    I N D E X
    Witness:                                        Page
 2  AVERY SCOTT HART, MD, FACP
          Examination by:
 3          MR. FLAXMAN...........................4
 4
 5
                     E X H I B I T S
 6  Dr. Hart                                       Page
      No. 1.........................................4
 7    No. 2........................................18
      No. 3........................................21
 8    No. 4........................................28
      No. 5........................................37
 9
10        C E R T I F I E D   Q U E S T I O N S
    Page                                          Line
11    (None.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

1        (Witness sworn.)
2        AVERY SCOTT HART, M.D., FACP,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5                    EXAMINATION
6                        BY
7                   MR. FLAXMAN:
8      Q    Good morning.  Would you state your name
9  and spell your last name, please?
10     A    Avery Scott Hart, H-a-r-t.
11     Q    And my understanding is that you've been
12 designated to appear as a witness to testify about
13 the matters specified in this notice which we will
14 mark as Exhibit 1.
15     MR. CATANIA:  I would just like for clarity,
16 are we going to mark all three of them separately?
17 When you say "this notice," I just wanted to find out
18 which one is it.
19     MR. FLAXMAN:  We'll start with No. 1.
20                    (Whereupon, DR. HART Deposition
21                     Exhibit No. 1 was marked for
22                     identification.)
23 BY MR. FLAXMAN:
24     Q    Is that correct?

Page 5

```
 1        A    Yes.
 2        Q    Okay.  Is the procedure the same today as
 3   it was in 2005 that's followed when a person being
 4   admitted to the jail informs intake personnel that he
 5   or she is enrolled in a methadone program and seeks
 6   to continue receiving methadone at the jail?
 7        A    Yes.
 8        Q    Is that procedure set out in a -- in
 9   writing?
10        A    Yes.
11        Q    How many -- and what's the form of the
12   writing in which that procedure is set out?
13        A    There's a policy.
14        Q    Do you know the name of the policy?
15        A    Well, it's the OTP policies.  O-T-P is the
16   designation for actually a small group of policies
17   all relating to the opioid treatment program which is
18   the treatment program under which methadone is
19   administered.
20        Q    How many policies make up the OTP policy?
21        A    In -- several years ago, there were
22   several.  They were recently consolidated into one
23   overall policy just for simplification of the
24   documents.
```

Page 6

1  Q   Were any changes made in the policies when
2  the policies were consolidated?
3  A   No substantial changes were made.
4  Q   And how many policies were consolidated
5  into one overall policy?
6  A   I think it was about three. They were all
7  closely related.
8  Q   When was -- when were the three closely
9  related policies consolidated into one overall
10 policy?
11 A   2010.
12 Q   Do you know the month?
13 A   No, I don't remember.
14 Q   Is there a particular number to the
15 consolidated policy?
16 A   From memory I think it is -- it may be
17 G-08.1, but I'm not certain.
18 Q   Okay. And what were the three policies
19 that were consolidated into that -- into that policy
20 that you think might be G-08.1?
21 A   There were three or so OTP policies. I
22 don't remember if they're numbers 1, 2, and 3, or
23 101, 102, 103. I don't remember the numbers, but
24 there were only three or so. They were all OTP

Page 7

1 hyphen -- followed by -- all OTP followed by a hyphen
2 followed by a number.
3     Q    Have you ever become aware of a policy
4 called 070502, methadone detoxification program?
5     A    I believe that was a duplication, a
6 different number assigned to the same policy.
7     Q    And is there a policy where -- that address
8 chemically dependent detainees?
9     A    Yes.
10     Q    And was that policy 0108G08?
11     A    You know, I'd have to look at the table of
12 contents of the policy manual to refresh my memory on
13 enumeration.
14     Q    Do you have that with you?
15     A    I do not.
16     Q    Do you have any of these policies with you?
17     A    I did not bring policies with me today.
18     Q    Well, what is the procedure when a person
19 being admitted to the jail informs intake personnel
20 that he or she is enrolled in a methadone program and
21 seeks to continue receiving methadone at the jail?
22     MR. CATANIA:  Objection to the form.
23     THE WITNESS:  The screener notes this
24 information and refers the patient to a physician

1   assistant or a physician.  Sometimes there are
2   physicians in intake as well as physician assistants.
3   Either one of those providers would then see the
4   patient, obtain a medical -- would perform a medical
5   interview and a physical exam, and would do a couple
6   of things.  Then would fill out a form which would
7   record where the inmate stated that he or she was
8   obtaining the methadone with whatever information the
9   inmate can provide about that, and would also
10  typically prescribe medications to help with any
11  withdrawal symptoms that the patient was experiencing
12  at that moment.
13           The physician assistant or physician
14  would then hand the patient the medications for
15  whatever withdrawal symptoms were being experienced
16  at that moment and would forward the information
17  about the methadone program to the pharmacy.
18           The pharmacy would then during the
19  regular business hours of the methadone program
20  contact the methadone program to verify whether the
21  information given by the inmate was correct.
22           In the approximately 50 percent of cases
23  where the inmate turned out not to have given correct
24  information in that the patient actually was not

Page 9

1    actively enrolled in a methadone program, the patient
2    would continue taking the symptomatic medication
3    which had been provided already, but would not be
4    eligible for methadone.
5                In the approximately 50 percent of cases
6    where the patient indeed actually was actively
7    enrolled, the program staff would confirm the amount
8    of dosage and the date of the most recent dose, and
9    the pharmacy would dispense the medication.
10               The patient would then taper over a
11   period of 21 days using a linear dosage taper from
12   the starting dose to zero.
13       Q    Was the -- is the tapered over 21 days
14   applied to everyone who had been in a methadone
15   program?
16       A    No.
17       Q    And in what situations is it not applied to
18   people who had been in the methadone program?
19       A    It's not applied to pregnant women who are
20   typically maintained on methadone throughout their
21   pregnancy, and it is not applied to selected
22   individuals who are taking extremely high doses of
23   methadone in which case the taper would sometimes be
24   more extended.

Page 10

1    Q    By "more extended" what do you mean?

2    A    I mean longer than 21 days.

3    Q    And how much longer can that be?

4    MR. CATANIA:  Objection to the form.

5    THE WITNESS:  That would depend on the specific
6 dose the patient was taking and how they were
7 tolerating the taper.

8 BY MR. CATANIA:

9    Q    Am I correct that aside from pregnant
10 women, everyone who comes into the jail who is in a
11 methadone program gets tapered -- gets tapered off of
12 methadone?

13    A    That is correct.

14    Q    Do you know why that is?

15    A    Do I know why that is?

16    Q    Yes.

17    A    Yes.

18    Q    Why is that?

19    A    Well, the -- our goal is not to run a
20 methadone maintenance program.  Our goal is to
21 alleviate the symptoms of withdrawal from methadone.
22 The exception, as I said, being pregnant women.

23    Q    Now, do you know why it is that your goal
24 is not to run a methadone maintenance program?

Page 11

1   A   Our positive goal is to alleviate the
2   symptoms of methadone withdrawal.
3   Q   But my question is do you know why your
4   goal is not to run a methadone maintenance program?
5   MR. CATANIA:  Objection to the form.
6   THE WITNESS:  That's not part of our mission.
7   BY MR. FLAXMAN:
8   Q   And when you say "our mission," who is the
9   "our"?
10  A   Cermak Health Services of Cook County.
11  Q   Do you know -- well, how -- how long has
12  that not been the mission of Cermak Health Services
13  of Cook County --
14  MR. CATANIA:  Objection to the form of the
15  question.
16  BY MR. FLAXMAN:
17  Q   Okay.  Let me finish my question.
18      I think you just told us that it's not
19  part of the mission of Cermak Health Services to run
20  a methadone maintenance program; did I understand
21  that correctly?
22  A   That is correct.
23  Q   Do you know when that mission or do you
24  know when Cermak Health Services started or began to