**Exhibit 16**



| | |
|---|---|
| | Category: Cermak Health Services |
| Subject: Special Needs and Services | Page: 1 of 8 / Policy #: G-06.1 |
| Title: OPIOID TREATMENT PROGRAM | Approval Date: June 20, 2012 / Posting Date: July 2, 2012 |

## PURPOSE

The purpose of this policy is to provide access to opioid treatment: (1) for detoxification of inmates who were enrolled in an opioid treatment program (OTP) immediately before arrest; and (2) for maintenance of pregnant women who are opioid dependent.

## AFFECTED AREAS

This policy affects all areas and employees of Cermak Health Services.

## POLICY

Cermak Health Services, as an operating unit of the Cook County Health and Hospitals System, will sponsor a certified, accredited, and licensed opioid treatment program (OTP). The purposes of this program are: (1) detoxification of newly admitted inmates who were enrolled in an OTP immediately before arrest; and (2) maintenance of pregnant women who are opioid-dependent for the duration of their pregnancies, with detoxification to follow delivery.

Cermak will comply with federal and state laws and regulations in its opioid treatment program, including 42 CFR 8.11-12 and 77 ILAC 2060. The certifying, accrediting, and licensing bodies will be, respectively: the Center for Substance Abuse Treatment (CSAT) of the Substance Abuse and Mental Health Services Administration (SAMHSA) of the US Department of Health and Human Services (DHHS); the National Commission on Correctional Health Care (NCCHC); and the Division of Alcohol and Substance Abuse (DASA) of the Illinois Department of Human Services (IDHS).

## DEFINITIONS (from 42 CFR 8.2)

*Certification* – the process by which SAMHSA determines that an opioid treatment program is qualified to provide opioid treatment under the federal opioid treatment standards.

*Accreditation* – the process of review and acceptance by an accreditation body that has been approved by SAMHSA to accredit opioid treatment programs using opioid agonist treatment medications.

*Program sponsor* – the person named in the application for certification described in Sec. 8.11(b) as responsible for the operation of the opioid treatment program and who assumes responsibility for all its employees, including any practitioners, agents, or other persons providing medical, rehabilitative, or counseling services at the program or any of its medication units. The program sponsor need not be a licensed physician but shall employ a licensed physician for the position of medical director.

*Program medical director* – a physician, licensed to practice medicine in the jurisdiction in which the opioid treatment program is located, who assumes responsibility for administering all medical services performed by the program, either by performing them directly or by delegating specific responsibility to authorized program physicians and healthcare professionals functioning under the medical director's direct supervision.

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 2 of 8 | G-06.1 |

*Detoxification* – the dispensing of an opioid agonist treatment medication in decreasing doses to an individual to alleviate adverse physical or psychological effects incident to withdrawal from the sustained use of an opioid drug and as a method of bringing the individual to a drug-free state. Short-term detoxification treatment means detoxification treatment for a period not in excess of 30 days. [However, taper from very high initial methadone dosage may exceed this time period.]

*Maintenance* – the dispensing of an opioid agonist treatment medication at stable dosage levels for a period in excess of 21 days in the treatment of an individual for opioid addiction.

## PROCEDURE

### A. Program administration
1. *Cermak's chief medical officer* (CMO) will designate a program medical director for the OTP.
2. *The program sponsor* will designate a program administrator for the OTP
3. *The program administrator* will:
   a. Ensure compliance with all state and federal regulations (see above);
   b. Ensure accessible and timely services for all program participants;
   c. Prepare monthly statistical reports as required by applicable state and federal regulations and submit to the medical director;
   d. Convene a multidisciplinary OTP Committee with representatives from the departments of Medicine, Mental Health, Pharmacy, and Laboratory;
   e. Facilitate meetings
      i. Schedule meetings at least quarterly;
      ii. Prepare agenda and minutes;
   f. Maintain archive of statistical reports and meeting minutes.
4. *The program medical director* will be an authorized methadone prescriber and will:
   a. Update this policy and any related policies for the program as needed, within the larger framework of the institutional policies of Cermak Health Services;
   b. Provide clinical oversight;
   c. Request waivers from CSAT when required for individual patients;
   e. Lead quality improvement efforts for the program;
   f. Delegate specific responsibilities to authorized program physicians and/or healthcare professionals functioning under his or her direct supervision, including a designated OTP coordinator.
   g. Develop a set of protocols for linear taper from a variety of starting doses of up to 120 mg/d, with daily doses decreasing at an integer rate proportional to initial dose, decreasing not more than 7 mg each day over a period of 10 to 21 days. *Example: From an initial dose 40 mg. reduce dose by 2 mg every day, reaching zero on Day 21.* h. Submit the protocols for approval by the OTP Committee.

### B. Initial enrollment
At the time of intake to the jail:
1. *The intake screener* will
   a. Ask whether the inmate reports participation in an opioid treatment program and, if so, will provide appropriate forms to complete (see below);
   b. Ask whether the inmate regularly uses heroin or opioid medications obtained on the street;
   c. Refer the patient to an intake clinician if either of the above questions is answered 'yes.'

CCSAO Rogers v. Dart 15 C 11632 00200
Plaintiff's Exhibit 16              Page 2 of 8

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 3 of 8 | G-06.1 |

2. *The inmate*, if wishing to continue ongoing opioid treatment while incarcerated, will:
   a. Fill out the upper portion of Cermak Form 853.14, "Methadone Referral," including his or her name and aliases, other identifying information, and name of previous program and counselor;
   b. Sign the consent for release of information on the referral form;
   c. Sign acknowledgment on Cermak Form 863.47, "List of Inmate Rights for the Opioid Treatment Program."
3. *The intake clinician* will interview and examine the patient. If a diagnosis of opioid dependence or addiction is made (see Appendix), and the patient affirms participation in an opioid treatment program at the time of incarceration, then proceed as follows:
   a. Enter the diagnosis of opioid dependence or addiction on the problem list in the clinical information system (Cerner) using ICD-9 code 304.x;
   b. Complete the health assessment form (see Cermak Policy E-04);
   c. Determine whether the patient is experiencing opioid withdrawal symptoms (see Cermak Policy G-06) and whether the patient is pregnant;
   d. For pregnant patients:
      i. If dependent on opioids and not previously enrolled in an OTP, refer to emergency room at John Stroger Hospital (via Cermak ER);
      ii. If dependent on opioids, previously enrolled in an OTP, and manifesting withdrawal, refer to emergency room at John Stroger Hospital (via Cermak ER);
      iii. If dependent on opioids, previously enrolled in an OTP, and not manifesting withdrawal, proceed as below.
   e. For all others: prescribe non-opioid medications for relief of withdrawal symptoms, as needed;
   f. If the patient has been participating in an opioid treatment program and wishes to continue, explain the process for enrollment and send an OTP Folder with the signed paperwork to the emergency room;
4. A designated Cermak staff member will, each morning, pick up any new OTP folders from the emergency room and, for each:
   a. Call the methadone program named by the inmate; if unable to make contact on a weekend or a holiday, document each attempt and continue calling daily until contact is made;
   b. Upon contacting the program, ascertain enrollment status;
      − If enrollment is denied by the program, document accordingly on the Methadone Referral Form and forward the form to the divisional health care team at the dispensary so that the clinician can notify the patient of the rejection. In that case, divisional staff will call the patient to dispensary for evaluation and management of withdrawal.
      − Or, if enrollment is confirmed, then continue as follows.
   c. Ask the methadone program to verify the amount and date of the last dose and to send documentation by fax;
   d. Forward the received fax to the Pharmacy;
5. *Pharmacy staff* will, upon receiving verification of program participation:
   a. Enter the approved patient into the Substance Abuse and Methadone Management System (SAMMS), which transmits patient information to the State of Illinois DASA database;
   b. Complete the lower portion of Cermak Form 853.14, "Methadone Referral;"
   c. Deliver the OTP Folder to the emergency room;

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 4 of 8 | G-06.1 |

    d. Contact the Security Office or the Shift Commander of the patient's housing division to arrange escort to the pharmacy; document date, time, phone extension, and name of person contacted on the referral form;
    e. Re-contact the shift commander on each shift until the inmate is escorted to the Pharmacy for the first dose, or until the patient is released from custody, whichever comes first; annotate the referral card for each reminder call;
    f. Order, by protocol, a urine drug screen on the inmate;
    g. Verify that the inmate has already consented for treatment (otherwise obtain consent);
    h. If the patient is pregnant:
        i. Verify that laboratory testing has confirmed the pregnancy
        ii. Fax a detoxification exception form to the Illinois State Methadone Authority (312-814-2419).
    i. Provide a copy of the verification fax, together with a copy of the pre-approved set of protocols for tapering, to the clinician on duty in the emergency room.

6. *The clinician on duty in the emergency room* will
    a. Interview and examine the patient and verify the diagnosis of opioid dependence or addiction (see Appendix);
    b. Complete a "History and Physical" form, entering a diagnosis of opioid dependence or addiction;
    c. In the electronic health record (Cerner):
        i. Confirm that opioid dependence or addiction has been entered on the problem list (ICD-9 code 304.x);
        ii. Enter an order to alert CCDOC for participation in the Opioid Treatment Program.
    d. Initiate Cermak Form 847.21, "Substance Abuse Treatment Plan," including an explicit diagnosis of opioid dependence;
    e. If the patient also is dependent on either alcohol or sedatives, consider maintaining dose until after the period of withdrawal from alcohol or sedatives – confer with a physician authorized to prescribe methadone as needed.
    g. Sign the prescription to start methadone treatment and specify the initial dose;
    h. For pregnant patients, prescribe a constant daily dose at the verified prior dosage;
        For other patients, prescribe a linear taper to zero, with daily doses decreasing at an integer rate proportional to initial dose, starting at the verified prior dosage and decreasing not more than 7 mg each day.
        – For prior maintenance doses up to 120 mg/d, taper over 10 to 21 days, using the pre-approved protocol developed by the program medical director.
        – For prior maintenance doses above 120 mg/d, confer with program medical director and consider a taper longer than 21 days
    i. Obtain countersignature from a physician authorized to prescribe methadone;
    j. For any patient starting with a methadone dose of 100 mg or more:
        i. Perform a baseline EKG and check the QT interval before the first dose;
        ii. If the QT interval is significantly prolonged, hold methadone and confer with program medical director;
    k. For any patient starting with a methadone dose of 180 mg or more:
        i. Hold methadone and confer with program medical director;
        ii. After conferring, arrange to observe the patient after the first dose in the emergency room, the infirmary, or intermediate medical housing;
    l. Send the patient and the OTP folder to the laboratory to obtain a urine sample for drug screening.

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 5 of 8 | G-06.1 |

7. *The laboratory* will:
   a. Perform a urine drug screen and send the report to the OTP program;
   b. Send the patient and the OTP folder to the pharmacy for administration of the first dose of methadone.
8. *The inmate* will:
   a. Provide a urine sample;
   b. Sign for the initial dose.
9. *The pharmacist* will:
   a. Prepare the initial dose of methadone oral solution, diluted in water or juice;
   b. Observe the patient swallow the dose;
   c. Annotate an appointment card for the inmate to bring each day while on the program.
   d. Notify the Patient Scheduling office to enroll the patient in the OTP Clinic.
10. *The Patient Scheduling office* will:
    a. Schedule the initial visit in the OTP Clinic and notify CCDOC of the appointment;
    b. Enter a health alert, "Opioid Treatment Program," in the information system.

## C. Daily dosing.
On each successive day until completion of the program:
1. *The inmate* will present his appointment card to the officer on the living unit.
2. *A CCDOC officer* will escort the participating inmate from the living unit to the Pharmacy, typically between 7:00 and 9:00 am except for inmates with court dates, who will be brought in the afternoon
3. *Pharmacy staff* will, if the inmate has not arrived by 6:00 pm, contact the shift commander and document the date, time, phone extension, and name of the shift commander on the daily methadone worksheet;
4. *The inmate* will present his appointment card to the pharmacist and sign for the day's dose
5. *The pharmacist* will:
   a. Check whether the inmate is due to complete a random drug screen, once between Day 8 and Day 14 and then again between Day 15 and Day 21 (and monthly thereafter, for those on long-term or maintenance methadone).; if due, ensure that the urine sample is obtained before the dose is given;
   b. Prepare the day's dose of methadone oral solution diluted in water or juice;
   c. If the inmate has been put into segregation, bring the dose to the patient's cell.
   d. Observe the patient swallow the dose;
   e. Annotate the appointment card.

## D. Clinical follow-up
1. *The OTP coordinator* will schedule each patient for at least one appointment with a program clinician during opioid taper and another upon completion of the taper.
2. *A program clinician* will, at the OTP clinic visit:
   a. Confirm in the electronic health record (Cerner) that opioid dependence has been entered on the problem list (ICD-9 code 304.x);
   b. Obtain additional details of history and check physical examination or lab results as indicated;
   c. Assess for symptoms and signs of active opioid withdrawal and treat as needed; consider slowing rate of taper if symptoms are severe.
   d. Offer HIV and hepatitis screening, as well as hepatitis B immunization;

| Title: | Page | Policy # |
|---|---|---|
| OPIOID TREATMENT PROGRAM | 6 of 8 | G-06.1 |

      e. Refer as needed to mental health and/or medical services;
      f. Provide additional patient education;
      g. If the patient opts to withdraw from the OTP, notify the divisional clinician to follow up.
      h. Formulate a plan with the inmate for follow-up care in the community in the event that the inmate is released, whether during the taper or after completion;
3. *The program medical director* will:
      a. Advise program clinicians regarding clinical and administrative matters as needed;
      b. Request a waiver from CSAT for these special cases:
          i. Detoxification more than twice in any 12-month period, or
          ii. Maintenance rather than detoxification, for a reason other than pregnancy

### E. Diversion control

1. *The pharmacy director* will:
      a. Stock and use only methadone oral solution for the OTP program;
      b. Store unopened methadone stock bottles in a DEA-approved safe, numbered consecutively, and accounted for daily;
      c. Limit access to the methadone safe to authorized pharmacists.
2. *Authorized pharmacists* will:
      a. Have only one stock bottle open at any time; withdraw a new bottle from the safe when needed;
      b. Refill the dispensing bottle to a maximum of 1000 ml of methadone oral solution;
      c. Keep both the opened daily bottle and the dispensing bottle in a locked cabinet when not in use;
      d. Inventory methadone stock at these times:
          i. End-of-shift – An exiting pharmacist and an incoming pharmacist each take and reconcile the inventory. Both enter their inventories on a DASA form, "Daily Methadone Accountability."
          ii. Weekly – take and record a separate inventory on the form Narcotic Use Record for Methadone.
          iii. In case of spillage or wastage – immediately inventory the methadone to determine amount lost and record on the daily methadone work sheet. A witness must verify and sign. Prepare and submit an incident report to the pharmacy supervisor before the end of the shift.
3. *Pharmacy administration* will review all records for accountability through its quality assurance program.
4. *The Director of Pharmacy* will submit all quality assurance reports and notification of all discrepancies to the OTP program administrator.

### SELF-MONITORING OF COMPLIANCE INDICATORS

1. *The director of pharmacy* will transmit an electronic data file listing all patients receiving methadone and their dosing to DASA for oversight by the state.
2. *The program medical director* will:
      a. Review all statistical and quality improvement reports and forward to Cermak's director of quality improvement, chief medical officer, and chief operating officer;
      b. In the event of an adverse health incident possibly related to the program, assign a physician to review the case and to submit a written report within 30 days;
      c. In the event of death of a program participant, either during or within 7 days after detoxification:
          i. Immediately notify both DASA and CSAT;
          ii. Conduct a mortality review in accordance with Cermak Policy A-10.

| Title: OPIOID TREATMENT PROGRAM | Page 7 of 8 | Policy # G-06.1 |
|---|---|---|

## CROSS REFERENCES

| NCCHC Standards addressed by this policy | G-06 |
|---|---|
| Pertinent ACA Standards | 4-ALDF-4C-36 |
| Cermak policy number in last revision | 01-08G-06; 07-05-02; OTP-111 |
| Revision dates of all previous versions | 2/2006, ..., 10/1987 for 01-08G-06 & 07-05-02; 4/2007 for OTP-111 |
| Date of last review, if later than last revision | n/a |
| Other related Cermak policies | G-06, G-07 |
| Pertinent system-wide CCHHS policies | n/a |
| Pertinent custody directives | n/a |

## APPENDIX -- Diagnosis of opioid dependence and addiction

Behavior supportive of a diagnosis of opioid dependence includes:
- Significant levels of tolerance resulting in experiencing withdrawal symptoms on abrupt discontinuation of opioid substances;
- Signs and symptoms that reflect compulsive, prolonged self-administration of opioid substances that are used for no legitimate medical purpose or, if a general medical condition is present that requires opioid treatment, use of opioid doses that are greatly in excess of the amount needed for pain relief;
- Such regular patterns of compulsive drug use that daily activities are typically planned around obtaining and administering opioids;
- Purchase of opioids on the illegal market or obtaining opioids by faking or exaggerating general medical problems or by receiving simultaneous prescriptions from several physicians;
- Engaging in drug-related crimes, such as, fraudulently writing prescriptions for opioids or diverting opioids prescribed for other patients or from pharmacy supplies. (DSM-IV-TR)

Behavior indicative of opioid addiction includes:
- Continuing use of the opiate despite known adverse consequences to self, family, or society;
- Obtaining illicit opiates;
- Using prescribed opiates inappropriately;
- Previous attempt(s) at tapering using methadone or other drugs.

The patient may not have physiologic dependence at present since this may be continuation of methadone use for a long time in the community without illicit use of opioid substances in the recent past.

CCSAO Rogers v. Dart 15 C 11632 00205
Plaintiff's Exhibit 16                    Page 7 of 8

| Title: OPIOID TREATMENT PROGRAM | Page 8 of 8 | Policy # G-06.1 |
|---|---|---|

**POLICY UPDATE SCHEDULE**
To be reviewed no later than 1 year after posting date.

**POLICY LEAD**      <u>Avery Hart, MD</u>
Chief Medical Officer

**REVIEWER(S)**      Cindy Kienlen, RN
Mary Ann Wrobel, PharmD
Quality Improvement Committee

**APPROVAL PARTY(IES)**      <u>/s/ Michael Puisis</u>
Michael Puisis, DO
Chief Operating Officer

<u>/s/ Avery Hart</u>
Avery Hart, MD
Chief Medical Officer

**REVIEW HISTORY**
Written: August 01, 2010
Revised: June 20, 2012