**Exhibit 20**

** C O N F I D E N T I A L **

1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3

KEITH ROGERS,             )
4                        )
         Plaintiff,    )
5                        )
   vs.                )  No. 15 CV 11632
6                        )
SHERIFF OF COOK COUNTY and  )
7 COOK COUNTY, ILLINOIS,    )
                        )
8         Defendants.   )

9

10

11   The deposition of STAMATIA Z. RICHARDSON,

12 M.D., called for examination pursuant to the

13 Rules of Civil Procedure for the United States

14 District Courts pertaining to the taking of

15 depositions, taken before Kathleen M. Duffee, a

16 Notary Public within and for the County of Cook

17 and State of Illinois, at 200 South Michigan

18 Avenue, Suite 200 Chicago, Illinois, on the 10th

19 day of May, 2018 at the hour of 11:12 a.m.

20

21

22

23 Reported by:  Kathleen M. Duffee, CSR

24 License No:   084-003497



Stamatia Z. Richardson, M.D. 05/10/2018
** C O N F I D E N T I A L **

```
 1   APPEARANCES:

 2       LAW OFFICES OF KENNETH N. FLAXMAN, PC,
         BY: KENNETH N. FLAXMAN, ESQUIRE,
 3       200 South Michigan Avenue, Suite 201
         Chicago, Illinois 60604
 4       (312) 427-3200,
         knf@kenlaw.com,
 5
                     Representing the Plaintiff;
 6

 7       SANCHEZ, DANIELS & HOFFMAN, LLP
         BY:  MEGHAN D. WHITE, ESQUIRE,
 8       333 West Wacker Drive, Suite 500
         Chicago, Illinois 60606
 9       (312) 641-1555,
         mwhite@sanchezdh.com,
10
                     Representing Defendant Sheriff of
11                   Cook County;

12
         KIMBERLY M. FOXX, STATE'S ATTORNEY OF COOK
13       COUNTY, ILLINOIS,
         BY:  JESSICA M. SCHELLER, ESQUIRE, and
14           LYLE K. HENRETTY, ESQUIRE,
         69 West Washington Street, Suite 2030
15       Chicago, Illinois 60602
         (312) 603-1427,
16       jessica.scheller@cookcountyil.gov,

17                   Representing Defendant Cook County,
                     Illinois.
18

19

20

21

22

23

24
```



McCorkle Litigation Services, Inc.                    3
Chicago, Illinois  (312) 263-0052

** C O N F I D E N T I A L **

1                    I N D E X

2    WITNESS                          EXAMINATION

3    STAMATIA Z. RICHARDSON, M.D.

4        By Mr. Flaxman                    5

5        By Ms. Scheller                 109

6

7                 E X H I B I T S

8    NUMBER                        MARKED FOR ID

9    Dr. Richardson Deposition

10       Exhibit No. 1                    12

11       Exhibit No. 2                    63

12       Exhibit No. 4                    90

13       Exhibit No. 6                    91

14       Exhibit No. 6A                   92

15       Exhibit No. 8                    94

16       Exhibit No. 10                   58

17       Exhibit No. 13                   28

18       Exhibit No. 15                   98

19       Exhibit No. 16                   55

20       Exhibit No. 17                   97

21

22

23        EXHIBIT NOS. 1 & 2 ARE ATTACHED

24    CONFIDENTIAL EXHIBITS RETAINED BY MR. FLAXMAN

1        (Witness sworn.)

2     MR. FLAXMAN:  Do you want to say something?

3     MS. SCHELLER:  So this record is taken

4  pursuant to the governing Confidentiality Order

5  entered in this case.  The court reporter has

6  signed the Confidentiality Order, and all

7  parties have agreed to proceed pursuant to its

8  terms today.

9     MR. FLAXMAN:  Okay.

10     MS. SCHELLER:  We will append the court

11  reporter's signature as an exhibit to the

12  transcript.

13        STAMATIA Z. RICHARDSON, M.D.,

14  called as a witness herein by the Plaintiff,

15  having been first duly sworn, was examined and

16  testified as follows:

17                EXAMINATION

18  BY MR. FLAXMAN:

19     Q.   Could you state your name and spell

20  your last name for us, please?

21     A.   My name is Stamatia Z. Richardson, and

22  my last name is R-I-C-H-A-R-D-S-O-N.  My first

23  name is S-T-A-M-A-T-I-A.

24     Q.   And what is your business or

1    occupation?

2        A.   I'm a physician.

3        Q.   And where are you presently employed?

4        A.   I'm employed by Cermak Health Services

5    of the Cook County Health and Hospitals System.

6        Q.   How long have you worked for Cook

7    County?

8        A.   Since August of 1993.

9        Q.   When did you first become a physician?

10       A.   June of 1990.

11       Q.   When did you -- well, before working

12   for Cook County, were you employed as a

13   physician?

14       A.   I was a resident physician.

15       Q.   Where were you a resident physician?

16       A.   I was at the Northwestern University/

17   St. Joseph Hospital family practice residency

18   program from 1990 to 1993.

19       Q.   And why did you leave there to go to

20   work for Cook County?

21       A.   I completed my residency program.

22       Q.   What are your present responsibilities

23   at Cermak Health Services?

24       A.   I presently am a Division Chair of

Stamatia Z. Richardson, M.D. 05/10/2018
** C O N F I D E N T I A L **

1  Correctional Health.  My title includes

2  administrative operations and quality.  I am

3  also the Medical Director of the Opioid

4  Treatment Program.

5       Q.   For how long have you been the Medical

6  Director of the Opioid Treatment Program?

7       A.   Since September of 2009.

8       MS. SCHELLER:  Counsel, just for the record,

9  the witness does have her CV in front of her,

10  and she did just reference it.  So you are

11  aware.

12       MR. FLAXMAN:  Okay.

13  BY MR. FLAXMAN:

14       Q.   Do you know who was the Medical

15  Director of the Opioid Treatment Program before

16  you?

17       A.   No.

18       Q.   Do you do any research in opioid

19  treatment?

20       A.   No.

21       Q.   Have you published anything about

22  opioid treatment?

23       A.   Only about Narcan overdose treatment.

24       Q.   And how many publications about --

1  grant moneys, where the City, Public Health

2  Department, and an Opioid Task Force that the

3  City put together wanted to start more patients

4  on medication-assisted treatment, we were able

5  to start more patients, to keep -- maintain

6  patients on methadone and to start patients on

7  buprenorphine.

8          We also, since April of last year, have

9  also had a VIVITROL program.

10     Q.   I didn't hear that.

11     A.   Since April of last year, we have also

12  had a VIVITROL program, which is also

13  medication-assisted treatment for Opioid Use

14  Disorder.

15          We don't live in a vacuum in jail.

16  Patients have to return to the community.  It

17  would be completely, utterly irresponsible to

18  start patients on medication-assisted treatment

19  if they don't have a provider to go to and can't

20  pay for it.

21     Q.   Am I correct that in July of 2017

22  Cermak Health Services changed its tapering

23  program?

24     A.   Yes.



1      Q.   Is that written?

2      A.   No, it is not.  It is an ongoing

3  policy.  We have not as of yet -- we, you know,

4  we yearly review our policies.  We have not

5  added addendums at this point.  We are still

6  developing our program.

7      Q.   Any other reason that it was changed

8  other than what you've told us?

9      A.   No, sir.  I told you it had to do with

10 the community standards, the community

11 resources, and the Affordable Care Act.  That

12 was the main reason it changed.

13     Q.   So am I correct that there was no

14 tapering program in January of 2018?

15     A.   Yes, there is still a tapering program.

16 Every individual is an individual with their own

17 history and their own Opioid Use Disorder,

18 possibly Polysubstance Use Disorder, and their

19 own resources in the community.  Everybody is

20 treated as an individual and makes an individual

21 treatment plan.

22     Q.   So at the present time are some

23 detainees subject to a tapering program and some

24 are not?

1      A.   Yes, sir.

2      Q.   And those who are not include more than

3  pregnant women?

4      A.   Yes.

5      Q.   Do you have any data about the number

6  of people who are being tapered and who are not

7  being tapered?

8      MS. SCHELLER:  I'm going to object to this

9  line of questioning to the extent it goes beyond

10  the temporal scope of the limitations of

11  discovery established by ECF No. 41.

12         Subject to that objection, we may do

13  some limited discovery into this, but I do not

14  want it to be construed in any way as a waiver

15  of our objection to extending the temporal

16  scope.

17      MS. WHITE:  And I join in that objection as

18  well.

19      MR. FLAXMAN:  So are you conceding that we

20  could resume this deposition if the judge grants

21  the pending motion?

22      MS. SCHELLER:  I said you can do a limited

23  inquiry.  So please ask your questions, counsel.

24  I concede nothing.



1    MR. FLAXMAN:  Are you agreeing that we could

2  resume this deposition if the Court extends the

3  temporal scope of the case?

4    MS. SCHELLER:  Counsel, I said you may

5  continue with a limited line of inquiry.  I will

6  let you know if at some point I think you've

7  gone too far, and I will instruct the witness

8  not to answer based on ECF No. 41, at which

9  point I will take a position as to whether or

10  not I would agree that the Court could reopen

11  the deposition.  My suspicion is that I would

12  not agree.

13  BY MR. FLAXMAN:

14    Q.   Is there any data of which you're aware

15  about the number of detainees, other than those

16  who are pregnant, who enter the jail who are

17  tapered and the number who maintain their dose

18  when they enter the jail?

19    A.   This is a fairly new program.  We are

20  still struggling, trying to figure out our best

21  approach to each patient.  We don't want to harm

22  any patients.  So our policy keeps changing, and

23  also our resources keep changing in the

24  community.



1          We are trying to build at a rate that

2     the community is building.  If we build any

3     faster, there won't be any providers for them to

4     go to, and that's something I really don't want

5     to happen.

6          Q.   My question was directed to people who

7     enter the jail while they are enrolled in a

8     methadone program.

9          A.   Uhm-hmm.

10          MS. SCHELLER:  You have to answer yes or no

11     or audibly.  She, the court reporter, cannot

12     take down uhm-hmm or hmm-hmm.

13          THE WITNESS:  I'm sorry.

14     BY MR. FLAXMAN:

15          Q.   Is there any data about the number of

16     people who enter the jail who are enrolled in a

17     properly recognized methadone program at the

18     present time who are tapered and who are not

19     tapered?

20          A.   If there are, I don't have that data

21     yet.  We are still developing.  The data is

22     constantly changing.

23          Q.   How is a decision made that someone

24     who's in a methadone program and enters the jail



1   should be tapered or should not be tapered?

2       A.   So we have a medical social worker who

3   has worked with our medical patients for years.

4   She doesn't meet these patients.  She looks at

5   their court cases, and she makes an educated

6   guess as to whether the patient is going to be

7   there for 60 days or less.  Sometimes her guess

8   is wrong, and then we're scrambling to have to

9   taper.

10           If a patient has to go to prison or if

11  a patient has to go to another county, we know

12  right away.  Let's look for other county

13  warrants, because those patients should continue

14  to taper.  Otherwise, they're going to go to a

15  county and, instead of tapering, they're going

16  to have to go cold turkey from a large dose.

17           None of our surrounding counties have

18  methadone programs.  So I don't feel like I'm

19  doing my patients any justice in maintaining

20  those patients.  Patients that know they're

21  going to prison have parole holds.

22           So we're learning, and it's not a

23  crystal ball.  We don't always know.  We think a

24  patient is going to be on probation.  The Public



1  Defender may think they're going to go on

2  probation, and then they get a 60 or 90-day

3  inpatient stay, and we can't find a bed that

4  will take them on methadone.

5        So it's very individualistic, and it's

6  not a for-sure.  We don't know who's coming or

7  going.  We're making an educated guess based on

8  past experience of patients for whom, whether we

9  should taper or not, and then we offer that to

10  the patient.

11        I can tell you that many of my patients

12  don't want to continue on maintenance.  They

13  want to taper because they're afraid of what's

14  going to happen in court.

15     Q.   You said many patients want to taper.

16  Is there any data of which you're aware as to

17  how many?

18     A.   I'm not keeping data at this point, but

19  I have offered to each patient whose case

20  qualifies for maintenance.  Not all of our

21  patients want to continue with their

22  maintenance.

23     Q.   Do you know how many don't want to?

24     A.   Only anecdotally, sir.  So maybe 10



1    percent.

2        Q.   You say qualify for maintenance.  Are

3    there any written guidelines to determine -- to

4    aid in determining whether someone is qualified

5    for maintenance?

6        A.   So I have not made those.  It's been

7    down through the social work department.  I

8    don't understand enough about cases.  It has to

9    deal with what kind of felony they have, whether

10   they're probationable.

11          We have not written these down in

12   stone.  Like I said, we are still trying not to

13   harm patients.  We have had patients go to

14   prison on large doses, and then we know that

15   they're going to have to go through a quick --

16   no taper.  They're going to be just stopped.

17       Q.   Is there more than one medical social

18   worker who makes these judgments?

19       A.   No, sir.  Just one.

20       Q.   What is his or her name?

21       A.   Vicky Hinds.

22       Q.   Would you spell -- well, Vicky is

23   V-I-C-K-Y?

24       A.   I'm not sure how she spells her name.



1     Q.    Okay.  And how does she spell her last

2  name?

3     A.    H-I-N-D-S.

4     Q.    H-I-N-E-S?

5     A.    D-S.  Hinds.

6     Q.    Oh, Hinds.  Okay.  Do you know if she's

7  keeping any records about her judgments?

8     A.    Not that I know of.

9     Q.    Did you ever talk with her about how

10  she should go about making a decision about

11  whether somebody should be tapered or not?

12     A.    So yes, we have talked about it, and

13  there is, you know, this is not a science.  We

14  can't say for sure what's going to happen to

15  somebody in court.

16        So we will ask the patients to sign

17  releases so we can talk to their lawyers, talk

18  to the PD, find out what the judge is thinking

19  of what their case is.  We do an educated guess.

20        So if we're not sure and the patient

21  really doesn't want to taper, we go that extra

22  step if we can.  We don't do that for warrants

23  out of county.  We don't do that for parole

24  holds because we know they're going to go to

1    prison or go to another county.

2        Q.   Is Vicky Hinds the person who makes the

3    decision about whether somebody tapers or

4    doesn't taper?

5        MS. SCHELLER:  Objection, mischaracterizes

6    prior testimony.  The witness has testified that

7    a recommendation is made and then discussed with

8    the patient, not that a decision is made by the

9    social worker.

10   BY MR. FLAXMAN:

11       Q.   Can you answer my question?

12       A.   I don't remember your question, sir.

13       Q.   Okay.  Who makes -- does Vicky Hinds

14   make the decision on whether somebody is tapered

15   or is maintained on methadone?

16       A.   She gives a recommendation as to

17   whether she thinks they're going to be there for

18   60 days or more.

19       Q.   And to whom does she make that

20   recommendation?

21       A.   To myself.

22       Q.   And when she makes that recommendation

23   to you, how do you assess that recommendation?

24       A.   She has patients that are very likely



1    to be less than 60 days; patients she's not sure

2    about; and patients she knows have holds, parole

3    holds, or certain kind of felonies.

4           I'm not a lawyer.  I don't understand

5    what these charges mean, but she knows certain

6    charges are not probationable.  Armed robbery,

7    murder, those patients are not going to be

8    offered maintenance because we don't know how

9    long they're going to be going through the

10   incarceration period.  So she makes

11   recommendations based on that.

12          On that middle group, we will ask

13   patients what they think is going to happen in

14   court.  We get releases from the Public

15   Defenders, and we work with them.

16      Q.   Have you given any consideration to

17   establishing written procedures for making the

18   judgment about -- for assistance in making the

19   judgment of whether somebody is maintained or

20   tapered?

21      MS. SCHELLER:  I'm going to object to the

22   form of the question as it's not relevant to any

23   claim or defense asserted and it's

24   argumentative.  You may answer.



Stamatia Z. Richardson, M.D. 05/10/2018
** C O N F I D E N T I A L **

1  BY THE WITNESS:

2      A.   Yes, we have.  This is the very

3  beginning, the first year of our program in

4  offering maintenance, and even we also have

5  different forms of medication-assisted

6  treatment.

7          Some of our patients want VIVITROL.

8  Some of our patients want buprenorphine.  So a

9  lot goes into that decision.

10          Some of the patients want to taper

11  because they want to start buprenorphine when

12  they leave.  It isn't quite so simple.  Every

13  patient, again, is an individual and has an

14  individual treatment plan that they participate

15  in.

16  BY MR. FLAXMAN:

17      Q.   Before July of 2017, was everybody,

18  other than those pregnant, subject to the

19  tapering program?

20      A.   Yes, they were.

21      Q.   Okay.  And was that a written policy at

22  Cermak Health Services?

23      A.   Yes.

24      Q.   Do you know when that policy started?

Stamatia Z. Richardson, M.D. 05/10/2018
** C O N F I D E N T I A L **

1     A.   Before my time.

2     Q.   Is it your testimony today that part of

3  the mission of Cermak Health Services is to run

4  a methadone maintenance program?

5     A.   No.

6     Q.   Well, do you run a methadone

7  maintenance program for some detainees?

8     A.   For some, but it's not my mission.

9     Q.   Is it part of your mission?

10    A.   No.  I strongly object to having

11  methadone maintenance in jail.  I feel we should

12  not be treating patients in jail.

13        Many of my patients are there for

14  violations of probation, and that really

15  troubles me.  The more -- the better we get at

16  treatment in jail, the more judges want to keep

17  patients in jail.  I mean, that goes against

18  everything I stand for.

19    Q.   You say many are there for violations

20  of probation?

21    A.   Yes, they are.

22    Q.   Do you have any data which speaks to

23  that?

24    A.   Only anecdotally.  We ask every single

Stamatia Z. Richardson, M.D. 05/10/2018
**   C O N F I D E N T I A L   **

1   patient why are you here and when do you think

2   you're going to go home, and many, many times, I

3   mean, more than 80 percent of my patients, I

4   mean, we can go through the Bates, we have all

5   the records here of the 200 patients right

6   around this time, and you'll see how many

7   patients were there for violation of probation,

8   without a new case.

9          So they're put in jail so they can

10   detox, and then they go to an inpatient

11   treatment.  That should all be done outside of

12   the scope of jail.

13       Q.   When you looked at the 200 and saw some

14   people who were there, who were at the jail for

15   violations of probation, is that in the medical

16   records?

17       A.   No, it's not.

18       Q.   Is that in the records that you looked

19   at in forming the opinions you're going to

20   provide in this case?

21       A.   I'm not sure I understand.

22       Q.   Well, how did you get the information

23   that people were there for VOP?

24       A.   So one of the questions we ask every

Plaintiff's Exhibit 20                    Page 20 of 20

