UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEITH ROGERS, *et al.*, ) | |
| ) | |
| Plaintiff, ) | No. 1:15-CV-11632 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| SHERIFF OF COOK COUNTY and ) | |
| COOK COUNTY, ILLINOIS, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Keith Rogers, James Hill, and Wanda Hollins each had been on a methadone-maintenance program to treat their heroin addiction before being detained in the Cook County Jail. Under the Jail's mandatory methadone-taper policy, the methadone dosage was reduced until zeroed out. Now, they have filed a lawsuit challenging that policy and moved for class certification on behalf of former Jail detainees who were subject to the policy. For the reasons that follow, the certification is granted in part, but the proposed class definition is modified. *See In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011) (discussing a district court's authority to modify the class definition).

**I. Background**

The Plaintiffs challenge the methadone-taper policy that was in place at the Cook County Jail until at least July 2017 (and perhaps even through October 2019). Under the policy, the Jail imposed a linear taper on all non-pregnant detainees taking methadone, eventually tapering down to a complete stop of methadone altogether. R.

1

153, Pls.' Mot. to Certify Class, at 2–4. Methadone is a medication commonly used to treat opioid use disorder. *See* Exh. 18 to R. 153, National Academies of Sciences, Engineering, and Medicine, *Medications for Opioid Use Disorder Save Lives*, at 20. In a linear taper, the dosage is decreased at regular intervals by a predetermined amount (for example, by 7 milligrams per day). Exh. 15 to R. 153, Cermak Health Services Policy G-06.1, ¶ 5(h).

The question at the heart of this case is whether opioid use disorder is best treated by a stable maintenance dose of methadone (or other similar medications), or by tapering medication over time with the goal of taking the patient off medication entirely. Both approaches are advocated under various circumstances by experts in addiction treatment. *See* Exh. 17 to R. 153, Amato, et al., *Methadone at Tapered Doses for the Management of Opioid Withdrawal*, 2013 Cochrane Database of Systematic Reviews (2013). The Plaintiffs challenge the Jail's "linear taper to zero" policy as a violation of the Fourteenth Amendment (for pretrial detainees) and the Eighth Amendment (for post-sentencing prisoners), as well as a violation of the Americans with Disabilities Act and the Rehabilitation Act. R. 153 at 2. Detainees with opioid use disorder, they contend, suffer from a chronic medical condition that requires ongoing medication as the treatment. *Id.* The Plaintiffs assert that, during the taper period, patients suffer from painful and difficult symptoms, including "anxiety, chills, muscle pain (myalgia) and weakness, tremor, lethargy and drowsiness, restlessness and irritability, nausea and vomiting and diarrhea." Exh. 17 to R. 153, at 2. Plaintiff Rogers, for example, alleges that he experienced severe pain, day-long bouts of

diarrhea, sweats, and nausea while tapering. R. 153 at 5 (citing Exh. 4, Rogers Dep., at 29, 30, 36–37). Plaintiff Hill alleges that he had nausea, vomiting, diarrhea, and trouble sleeping while tapering. R. 153 at 5–6 (citing Exh. 9, Hill Dep., at 15–16, 23). And Plaintiff Hollins alleges that she had nausea, stomach cramps, and body aches, and also felt cold while tapering. R. 153 at 6 (citing Exh. 13, Hollins. Dep., at 44, 45).

Beyond the immediate suffering caused by tapering, the Plaintiffs also allege that the Jail's taper-to-zero policy is harmful in the long run. R. 153 at 4. They cite medical studies suggesting that tapering causes high rates of relapse, and that medication maintenance is the standard of care for opioid use disorder, especially for patients whose brain chemistry may have been permanently altered by prolonged opioid use. *Id.* at 2. Therefore, the Plaintiffs argue, the Jail's policy causes not only the short-term harms of withdrawal, but serious longer-term risks including relapse and fatal overdose. *Id.*

The Jail applied this policy to all non-pregnant detainees who had been in a lawful methadone or opioid antagonist program before entering the Jail. Exh. 15 to R. 153. (Pregnant detainees were allowed to maintain a consistent methadone dosage. *Id.*) The linear-taper-to-zero policy was in place at the time Hill entered the Jail on December 23, 2013, which is the proposed start date for the class. R. 153 at 5, 15. The proper end date for any potential class is a matter of dispute. Cook County says that "there was a significant change in policy in July 2017," when it abandoned the universal linear-taper policy in favor of an individualized approach to each detainee's treatment. R. 157, Def.'s Resp. at 1. Cook County supports this contention with the

3

declaration and deposition testimony of Dr. Stamatia Richardson, the medical director of the Jail's opioid treatment program. *See* Exh. A to R. 157, Decl. of Stamatia Richardson; Exh. B to R. 157, Dep. of Stamatia Richardson. But Dr. Richardson expressly testified that the Jail did not keep any records of this change in practice. Richardson Dep. at 43. In contrast, the Plaintiffs argue that the class should extend to October 7, 2019, when the Jail formally adopted a new written policy for opioid treatment. R. 167, Pls.' Reply, at 3. Under the Jail's current policy, detainees lawfully taking an opioid antagonist when they enter the Jail may take the same medication dosage while in custody. Exh. 23 to R. 167, Cermak Policy G-07.1.

Other than the linear-taper policy's end date, the basic facts are not in dispute. Both sides agree that the Jail applied a linear-taper-to-zero policy to all non-pregnant detainees who had been lawfully taking an opioid antagonist before their detention. (Cook County, though, argues that each patient's taper plan was individualized to some extent; the plan was based on the detainee's prior dosage and other considerations, such as individual health issues and whether the particular detainee was likely, after leaving the Jail, to be incarcerated or instead to return to the community. *See, e.g.*, R. 157 at 3.) In their class-certification briefing, the Plaintiffs and the Jail dispute the medical propriety of that policy—a merits question—and, of course, whether the Plaintiffs' challenges are suitable for class certification, or best brought as individual suits.

## II. Legal Standard

Courts usually should decide the question of class certification before turning to the merits of a given action. *See Wiesmueller v. Kosobucki*, 513 F.3d 784, 787 (7th

4

Cir. 2008). To be entitled to class certification, a plaintiff must satisfy each requirement of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as one of the subsections of Rule 23(b). *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012) (citation omitted). "Failure to meet any of the Rule's requirements precludes class certification." *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009) (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008)) (internal quotation marks omitted).

"A class may be certified only if 'the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied.'" *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 916 (7th Cir. 2011) (emphasis in original) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–351 (2011)). The named plaintiff bears the burden of showing by a preponderance of the evidence that all of Rule 23's requirements are satisfied. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Messner*, 669 F.3d at 811. The Court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)); *see also Dukes*, 131 S. Ct. at 2551 (recognizing that class-certification analysis "[f]requently … will entail some overlap with the merits of the plaintiff's underlying claim"). In the end, the Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Ervin v. OS Restaurant*

5

*Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (internal quotation marks and citation omitted).

Because plaintiffs have sought to certify this class under Federal Rule of Civil Procedure 23(b)(3), the Court will first analyze the prerequisites of Rule 23(a), and then make findings as to whether, as Rule 23(b)(3) requires, "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### III. Analysis

### A. Rule 23(a)

Federal Rule of Civil Procedure 23(a) contains four "prerequisites" to class certification: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(1)–(4).

For Rule 23(b)(3) proposed classes, "courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Though the term "ascertainability" is sometimes used to *describe* this implicit requirement, the Seventh Circuit has declined to impose the *heightened* "ascertainability" standard

that some other circuits have required. *Id.* at 658. Essentially, "there is a 'definiteness' requirement implied in Rule 23(a)." *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) (citations omitted); *see also Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ("It is axiomatic that for a class action to be certified a 'class' must exist." (citations omitted)). Beyond being required to evaluate the Rule 23(a) prerequisites, the definiteness requirement serves two more purposes. First, it alerts the parties and the Court to the burdens that identification of the class might entail, which is relevant to whether the proposed class action is manageable. *Simer*, 661 F.2d at 670. Second, ascertaining a definite class ensures that the parties actually harmed by the defendants' conduct will be the recipients of any relief eventually awarded. *Id.*

The Plaintiffs have proposed the following class definition, *see* R. 153 at 9, though now with an end date (that is, October 7, 2019):

> All persons who (a) entered the Cook County Jail on and after December 23, 2013 or (b) opted out of, or are otherwise excluded from, participation in *Parish v. Sheriff*, 07-cv-4369, and were, at the time of entry into the Jail, lawfully taking an opioid antagonist, as defined in 42 C.F.R. 8.12(h)(2), who were not then on parole or held on a warrant from another jurisdiction, and who were not pregnant.

### 1. Numerosity

On the Rule 32(a) prerequisites, Cook County does not contest the numerosity of the proposed class. Indeed, the Plaintiffs have shown that at least 1,090 detainees were subject to the Jail's methadone-taper policy during the relevant time period, even if the end-date is July 2017 (when Cook County says the Jail discontinued the mandatory taper policy); only around 137 detainees of the 1,090 are from the disputed

7

time period. R. 153 at 10–11 (citing Exh. 19, List of Fully Tapered Detainees, Sept. 2013–Mar. 2019). This group is "large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). So numerosity is readily satisfied.

## 2. Commonality

On commonality, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To establish commonality, generally speaking the class representative must demonstrate that members of the class "have suffered the same injury." *Dukes*, 131 S. Ct. at 2551. Put another ways, commonality requires that all of the class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. In *Dukes*, the Supreme Court concluded that what is most relevant to class certification "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. (cleaned up).[1]

The Plaintiffs here argue that liability turns on one set of dispositive legal questions, with no factual variation among them: whether the Jail's tapering policy

---

[1]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

8

violates the Eighth Amendment, the Fourteenth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. R. 153 at 11–12. Cook County argues that this is not enough—that, even if the legal questions are common, the answers they generate would not be, in large part because the class members' injuries are different. R. 157 at 8. Cook County makes the important point that the linear-taper policy did not impose the *same* taper on all patients (rather, tapers were individually calculated), and that patients' symptoms during the taper period would have varied. R. 157 at 8, 9.

Although the County's concerns have some force, they are not enough to outweigh the other considerations that justify a finding of commonality. Indeed, the concerns are not all that unusual: a similar problem often arises in products-liability cases, where each end user might have suffered a somewhat different injury. Yet those cases are often certified as class actions; individual variability in *injury* is taken into account at the *damages*, rather than the liability, phase of a case. *See, e.g.*, *In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 601–03 (7th Cir. 2014). The same goes for the concern that each taper was individually calculated. Yes, the particular milligram-decrease reduction might have differed from detainee to detainee. But the fact that *every* class-member detainee was subject to tapering—and whether across-the-board tapering was lawful—presents a liability question that can be answered with a *common* liability decision. *Dukes* requires a common injury and a common answer only in the sense that class members' injuries are all allegedly caused by the *same conduct* of the defendant and can be answered with the *same*

9

*liability* decision; the injuries need not be exactly the same, so long as the Court can answer the liability question in one common stroke. *Id.* at 602. That is the case here: the plaintiffs have argued that imposing a uniform linear-taper-to-zero policy is unlawful. Although patients' withdrawal symptoms may vary, they are all caused by common conduct—the same linear-taper-to-zero policy, applied without exception to non-pregnant detainees.

Having said that, the governing *legal* standards will require, for the constitutional claims, that the class be split in two; and for the statutory claims, the applicable legal standard undermines the propriety of certification for the statute-based claims. In other words, the Plaintiffs' proposal sweeps too broadly in lumping together the varying legal questions that arise under the Fourteenth Amendment, Eighth Amendment, Americans with Disabilities Act, and the Rehabilitation Act.

First, the Court's revised class definition separates pretrial detainees from post-sentencing prisoners. Pretrial detainees' rights are governed by the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979). On the merits, pretrial detainees "can prevail by providing only objective evidence that the challenged governmental action [here, the linear-taper-to-zero policy] is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). It is true that, before *Kingsley*, the Seventh Circuit generally applied the Eighth Amendment deliberate-indifference standard to the medical-care claims of pretrial detainees. But in the wake of *Kingsley*, the Seventh Circuit has since explicitly changed course on

10

the claims of pretrial detainees. *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Thus, "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Id.* Liability still requires that the defendant acted "purposefully, knowingly, or perhaps even recklessly," but that action is then measured against objective reasonableness. *Id.* at 353–54.

In contrast, post-sentencing prisoners' claims are governed by the Eighth Amendment, *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994), which requires that prisoners show "deliberate indifference," that is, "a showing that the defendant had a 'sufficiently culpable state of mind' and asks whether the official actually believed there was a significant risk of harm." *Miranda*, 900 F.3d at 350. So, at a minimum, the Fourteenth and Eighth Amendment claims differ in the required state of mind in devising the taper-to-zero policy. Therefore, Class 1 shall comprise pretrial detainees and Class 2 shall comprise post-sentencing prisoners.

Moving on to the statutory claims, the Americans with Disabilities Act (ADA) and Rehabilitation Act claims are not suitable for class-action treatment at all. To prove those claims (which are generally governed by the same legal standard), plaintiffs would need to show (1) that they were qualified persons (2) with a disability and (3) that the Jail "denied [them] access to a program or activity because of" the disability. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 672 (7th Cir. 2012). "Refusing to make reasonable accommodations is tantamount to denying access." *Id.* Even assuming for argument's sake that all class members would be qualified persons with

11

a disability (their opioid use disorder), the commonality of the class founders on the reasonable-accommodation requirement. The question of what medication regimen constituted a reasonable accommodation—and thus, whether an accommodation was denied—varies by patient.

In response, the Plaintiffs do not really develop the statutory claims beyond bare assertions. Even fashioning an argument for the Plaintiffs does not help. Their best foot forward would to argue that the linear-taper policy is *per se* unreasonable under the ADA and the Rehabilitation Act, because the detainees did not receive an individualized interactive process to arrive at an accommodation. But that position does not survive Rule 23(a)(2)'s commonality requirement. Although the ADA contemplates an interactive process to determine reasonable accommodations, that process "is not an end in itself." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000). The Plaintiffs still must show that that failure of the process *resulted* in the failure to provide a reasonable accommodation. There would not necessarily be a common answer on liability; the class's claims would not rise or fall together, and instead would require an individualized factual inquiry even on liability. *See id.* Plaintiffs Rogers, Hill, and Hollins remain free to pursue their ADA and Rehabilitation Act claims on an individual basis, but not as representatives of a certified class.

### 3. Typicality & Adequacy

Next, Cook County argues that the proposed class cannot satisfy the typicality requirement, Fed. R. Civ. P. 23(a)(3), nor the adequacy requirement, Fed. R. Civ. P. 23(a)(4). But the defense largely restates its arguments against commonality. First,

12

Cook County argues that because the Jail's linear-taper-to-zero policy was changed in July 2017, the Plaintiffs, who were detained before that time, are too different from detainees who were held in custody after July 2017. R. 157 at 12–13. But this is a matter of setting the class closing date appropriately, rather than rejecting certification altogether. Both sides agree that Cook County Jail instituted a new *written* policy on October 7, 2019. *See* Exh. 22 to R. 167, Email from Cook County Attaching New Policy. As discussed earlier, Cook County says that it stopped the across-the-board taper policy in July 2017, despite the absence of a written change in policy. The Plaintiffs dispute this, not least of which based on the absence of records to demonstrate that the change happened before the issuance of the October 2019 written policy. As the litigation proceeds, the parties will have the opportunity to fully litigate this end-date question. At the appropriate time, the Court will decide whether the end-date should stay as-is (October 7, 2019) or instead must be modified and truncated. It might very well be that an evidentiary hearing will be needed—neither side has asked for that yet—because the end date might turn on credibility decisions as to witnesses. Indeed, if one side (or both) believes that sufficient discovery has been taken on this issue and wishes the Court to convene an evidentiary hearing, then the party may file a motion at any time.

Second, Cook County restates its argument that because each patient was given an individualized taper-to-zero regimen and might have experienced different (or no) withdrawal symptoms, no one of the Plaintiffs can be said to be typical or representative of the proposed class. R. 157 at 12. Again, for the reasons already

13

discussed, this is a damages question, rather than a liability question (at least as to the Fourteenth and Eighth Amendment claims). So *if* the case moves on to the damages phase, then the parties and the Court will discuss how best to manage that phase of the litigation.

Third, Cook County argues that "many of the putative class members have suffered no injury," whether because the taper on which they were placed was medically appropriate, or because they did not experience withdrawal symptoms or relapse. R. 157 at 12. Similarly, Cook County argues that because the named Plaintiffs themselves have not relapsed into opioid use, they cannot challenge the linear-taper policy on the grounds that it increases risk for relapse. Indeed, the defense argues that the Plaintiffs' failure to relapse is a fatal causation problem that prevents the Plaintiffs from even being able to claim that the policy subjected them to this *risk*. But these arguments confuse success on the merits with suitability for class-action adjudication. "[A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable, given that a class can be certified yet fail to prove its case on the merits." *Lacy v. Cook County, Illinois*, 897 F.3d 847, 864 (7th Cir. 2018) (citation and quotation omitted). As explained earlier, the Plaintiffs have raised common liability questions on the constitutional claims. They may or may not succeed in proving on the merits that the linear-taper-to-zero policy

14

was inappropriate for any, let alone all, of the class members. But those are questions for the merits stage.[2]

In conclusion, the Court finds that plaintiffs' Fourteenth and Eighth Amendment claims, if broken out by subclasses of pre- and post-trial detainees, satisfy Rule 23(a)'s four prerequisites for class certification.

### B. Rule 23(b)(3)

Even if a proposed class satisfies Rule 23(a), it still must *also* satisfy the requirements of one of the three subtypes of class actions under Rule 23(b). Here, the Plaintiffs seek to certify the class under Rule 23(b)(3). R. 153 at 8. That rule permits the certification of a class if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." It also identifies four "matters pertinent to these findings": (A) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (B) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (C) "the desirability or undesirability of concentrating the litigation of claims in the particular forum"; and (D) "the likely difficulties in managing a class action."

Although similar to commonality, "the predominance criterion is far more demanding." *Messner*, 669 F.3d at 814 (quoting *Amchem Prods., Inc. v. Windsor*, 521

---

[2]Cook County also raised arguments against typicality and adequacy elements on the ADA and Rehabilitation Act claims. Because the Court has already held that those statutory claims fail for lack of commonality, there is no need to address those arguments.

15

U.S. 591, 623–24 (1997)). Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." The Court thus must compare the role of common issues of law and fact with the role of individual issues, including whether the Court must examine individual transactions in deciding the claim. *See Messner*, 669 F.3d at 815; *see also Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 738 (7th Cir. 2011).

Here, on the Fourteenth and Eighth Amendment claims that survived the Rule 23(a) prerequisites, the Court finds that common questions predominate over individual issues, and that the class mechanism is the superior means of adjudication. First, the Plaintiffs challenge the across-the-board taper policy. As discussed earlier, the Fourteenth and Eighth Amendment factual and legal inquiries revolve entirely around the conduct and state of mind of Cook County Jail officials in devising the policy across-the-board—questions that are necessarily common to all class members. Factual variations among class members, such as withdrawal symptoms they may have experienced, will arise only as to damages and not as to liability. It is true that, in some cases, the damages questions are so difficult to manage that they overwhelm the commonality in the liability question. For example, it would be one thing if the record evidence showed that tapering caused vastly different reactions that medical experts would not be able to predict or that class members would not be able to readily describe. But the variability in damages is not likely to be so extreme amongst the

16

class members that it would be better to have hundreds of separate cases instead of a single class action.

Second and relatedly, the class device is vastly more efficient than adjudicating the same question repeatedly across the 1,000 or so separate lawsuits that could, in theory, be brought by the class members as individual lawsuits. At the liability stage, managing the class action will be relatively straightforward, relying primarily on evidence arising from the records governing the policy, testimony of certain Jail officials, and expert evidence. R. 153 at 15. The parties likely will present cross-motions for summary judgment on liability, and either one side will win outright on liability via summary judgment or a jury will decide the class-liability issue. If liability is found, then a damages-setting mechanism can be developed with input from the parties. For example, medical records might describe the withdrawal symptoms, or under-oath surveys can be taken from the class. Also, different categories of symptoms might result in damages amounts that are fixed according to a certain schedule, including the number of days that the class member suffered the symptom. The bottom line is that getting the common liability answer across the class in one fell swoop is much more important than the separate damages questions.

## IV. Conclusion

The Plaintiffs' motion for class certification is granted as to the Fourteenth and Eighth Amendment claims and denied as to the Americans with Disabilities Act and

Rehabilitation Act claims. On the constitutional claims, the class definition is modified as follows:

> **Class 1 (Pre-trial Detainees)** comprises all pre-trial detainees who (1) entered the Cook County Jail between December 23, 2013 and October 7, 2019, inclusive and[3] (2) opted out of, or are otherwise excluded from, participation in *Parish v. Sheriff*, 07-cv-4369; and were, at the time of entry into the Jail, lawfully taking an opioid antagonist, as defined in 42 C.F.R. 8.12(h)(2), who were not then on parole or held on a warrant from another jurisdiction, who were not pregnant, and who received more than one dose of methadone while detained;
>
> **Class 2 (Post-sentence Prisoners)** comprises all post-sentencing prisoners who (1) entered the Cook County Jail between December 23, 2013 and October 7, 2019, inclusive and (2) opted out of, or are otherwise excluded from, participation in *Parish v. Sheriff*, 07-cv-4369; and were, at the time of entry into the Jail, lawfully taking an opioid antagonist, as defined in 42 C.F.R. 8.12(h)(2), who were not then on parole or held on a warrant from another jurisdiction, who were not pregnant, and who received more than one dose of methadone while detained.

The parties shall confer on the class notice and class-notice plan; shall confer on the litigation plan going forward, moving on to the merits of the liability questions; and shall initiate settlement negotiations. The tracking status hearing of December 11, 2020, is reset to January 15, 2021, at 8:30 a.m., but to track the case only (no

---

[3]Unless the Court is missing something, the conjunction here should be "and" rather than what the Plaintiffs propose, which is "or." If the resolution of *Parish* does not include the challenge to the tapering policy, then the parties may seek a change to the class definitions here.

appearance is required, the case will not be called). Instead, the parties shall file a joint status report by January 7, 2021, proposing the next steps of the litigation.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 29, 2020