**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Keith Rogers, James Hill, and Wanda Hollins, | |
| Plaintiffs, | No. 1:15-CV-11632 |
| v. | Judge Edmond E. Chang |
| Sheriff of Cook County and Cook County, Illinois, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Keith Rogers, James Hill, and Wanda Hollins each took regular doses of methadone to treat their opioid addiction before they were detained in the Cook County Jail. R. 308, Defs.' Resp. to PSOF ¶¶ 25, 30, 36; R. 302, Pls.' Exh. 1, Rogers Methadone Referral Form; R. 302, Pls.' Exh. 4, Hill Methadone Referral Form; R. 302, Pls.' Exh. 7, Hollins Methadone Referral Form.[1] Under the Jail's mandatory methadone-tapering policy, their methadone dosage was gradually reduced during their detention. Defs.' Resp. to PSOF ¶¶ 13, 26, 32, 39; R. 302, Pls.' Exh. 16, 2012 Tapering Policy at 4; R. 302, Pls.' Exh. 3, Rogers Dosing History; R. 302, Pls.' Exh. 6, Hill Dosing History; R. 302, Pls.' Exh. 9, Hollins Dosing History. The Plaintiffs bring class-action claims against Cook County and the Sheriff of Cook County on behalf of detainees who were subject to the Jail's tapering policy, alleging that the policy violated the

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

Fourteenth Amendment (for pretrial detainees) and the Eighth Amendment (for post-sentencing prisoners). R. 299, Pls.' Resp. to DSOF ¶ 5; R. 133, Second Am. Compl. ¶¶ 36–42. They also bring individual claims for unconstitutional delays in receiving their initial methadone dose, and for violations of Title II of the Americans with Disabilities Act (known as the ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Pls.' Resp. to DSOF ¶ 5; Second Am. Compl. ¶¶ 29–35.[2]

The parties cross-move for summary judgment on the class claims. R. 274, Defs.' Mot; R. 275, Defs.' Br. at 2–13; R. 283, Pls.' Mot. The Defendants also move for summary judgment on the individual claims. Defs.' Br. at 13–15. Because there are genuine disputes of fact material to the class claims, the parties' cross-motions are denied (except the Defendants' motion as to Hollins, which is granted because Hollins is not a member of the class). And because the named Plaintiffs raise a dispute of material fact on their reasonable accommodation claims, the Defendants' motion for summary judgment on the ADA and Rehabilitation Act claims is also denied. But the Defendants' motion for summary judgment on the individual constitutional claims is granted because the record evidence does not permit a jury finding to support *Monell* liability.

---

[2]This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

## I. Background

When deciding each party's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Opioid use disorder (which the parties call OUD) is a chronic disease that causes uncontrollable cravings for opioids, increased opioid tolerance, and withdrawal symptoms when not using opioids. Defs.' Resp. to PSOF ¶ 1; R. 303, Pls.' Exh. 23, Mangat Rep. at 2. OUD can be treated with medications—called opioid antagonists or opioid agonists—that prevent withdrawal symptoms without creating the same "high" that many illicit opioids produce.[3] Pls.' Resp. to DSOF ¶¶ 8–12; R. 302, Pls.' Exh. 11, Mangat Dep. at 60:5–61:5. So some individuals treat OUD by taking regular doses of these medications, including methadone, from a licensed Opioid Treatment Program (known as an OTP). R. 300, PSOF ¶ 9; Mangat Rep. at 5; Pls.' Resp. to DSOF ¶ 14; R. 302, Pls.' Exh. 12, Fatoki Dep. at 38:18–39:1.

From around 2012 to July 2017, the Cook County Jail had a mandatory methadone-tapering policy. R. 276, DSOF ¶¶ 31, 37; 2012 Tapering Policy at 1, 4; R. 290, Pls.' Exh. 13, Richardson Dep. at 38:19–39:7. Under this policy, non-pregnant detainees who were regularly taking opioid antagonists to treat OUD prior to their

---

[3]The parties are not clear about whether any clinical differences between opioid antagonists and opioid agonists matter in this case. The parties either use the terms interchangeably, *see* Second Am. Compl. ¶¶ 36, 42, or refer to them collectively as medications for OUD, DSOF ¶¶ 9–12. Because the dispute appears immaterial and the class definition refers to "opioid antagonists," the Court uses that label to refer to any medications for OUD, including opioid agonists.

3

detention were gradually given smaller doses of methadone until they were completely weaned off the medication. Pls.' Resp. to DSOF ¶ 31; 2012 Tapering Policy at 4. The taper was linear, meaning that the dosage decreased at regular intervals by a predetermined amount (for example, by 7 milligrams per day). Pls.' Resp. to DSOF ¶ 31; 2012 Tapering Policy at 4.

The Plaintiffs contend that OUD is best treated by a stable dosage of opioid antagonists, rather than tapering off that medication. PSOF ¶¶ 5, 9; Fatoki Dep. at 106:9–23; Mangat Rep. at 5. Tapering generally causes withdrawal symptoms—such as chills, muscle pain, tremors, nausea, vomiting, and psychological symptoms—that can last for weeks. PSOF ¶¶ 3, 6–7; Mangat Rep. at 1–3. Tapering also has long-term consequences: it increases a detainee's risk of relapse, overdose, and death when they are released from detention. PSOF ¶¶ 2, 4, 10; R. 302, Pls.' Exh. 21, Fatoki Rep. at 2; Mangat Rep. at 2–3, 5.

But the Defendants assert that it was infeasible for the Jail to maintain detainees on regular doses of opioid antagonists. DSOF ¶ 21; Fatoki Dep. at 97:4–98:1; Mangat Dep. at 70:1–18. Most correctional institutions in the country did not provide opioid antagonists at all to detainees during this period (forcing them to go "cold turkey"). DSOF ¶¶ 19, 22; Fatoki Dep. at 124:21–24, 128:9–19; Mangat Dep. at 70:19–71:12. Tapering is better than making detainees go cold turkey because it typically causes less severe withdrawal symptoms. Pls.' Resp. to DSOF ¶¶ 54–55; Mangat Dep. at 72:16–73:5; Fatoki Dep. at 164:5–13. The Cook County Jail also provided other treatment to detainees while tapering, such as non-opioid-antagonist medications to

4

treat withdrawal symptoms and mental health programming. DSOF ¶¶ 33, 35; 2012 Tapering Policy at 3; Richardson Dep. at 59:21–60:15.

The Plaintiffs allege that the Jail's tapering policy falls below the constitutionally required medical standard of care, and thus bring class claims for violations of the Eighth and Fourteenth Amendments. Pls.' Resp. to DSOF ¶ 5; Second Am. Compl. ¶¶ 36–42. The Court certified two subclasses—for pretrial detainees and post-sentencing prisoners, respectively—who:

> (1) entered the Cook County Jail between December 23, 2013 and July 1, 2017, inclusive and (2) opted out of, or are otherwise excluded from, participation in *Parish v. Sheriff*, 07-cv-4369; and were, at the time of entry into the Jail, lawfully taking an opioid antagonist, as defined in 42 C.F.R. 8.12(h)(2), who were not then on parole or held on a warrant from another jurisdiction, who were not pregnant, and who received more than one dose of methadone while detained.

Pls.' Resp. to DSOF ¶ 2; R. 243, Decert. Op. at 14–15. During the class period, 1,830 detainees were admitted to the OTP at the Cook County Jail. Defs.' Resp. to PSOF ¶ 42; R. 303, Pls.' Exh. 26, OTP Admissions. 1,780 of those detainees were subjected to the tapering policy. Defs.' Resp. to PSOF ¶ 43; R. 303, Pls.' Exh. 28, Non-Tapered Detainees. Of the estimated 1,780 class members, 79 were post-sentencing prisoners, Defs.' Resp. to PSOF ¶ 45; R. 303, Pls.' Exh. 30, Tapered Sentenced Detainees, and the other 1,701 were pretrial detainees.

The three named Plaintiffs also bring claims for violations of the ADA and Rehabilitation Act, and Rogers and Hollins bring individual constitutional claims for delays in receiving their initial methadone dose. Pls.' Resp. to DSOF ¶ 5; Second Am.

Compl. ¶¶ 29–35. The three named Plaintiffs were each taking regular doses of methadone to treat OUD when they entered the Cook County Jail. Defs.' Resp. to PSOF ¶¶ 25, 30, 36; Rogers Methadone Referral Form; Hill Methadone Referral Form; Hollins Methadone Referral Form. Each waited at least a day to receive their first dose of methadone at the Jail. Defs.' Resp. to PSOF ¶¶ 25–26, 30–31, 36, 39; Rogers Methadone Referral Form; Rogers Dosing History; Hill Methadone Referral Form; Hill Dosing History; Hollins Methadone Referral Form; Hollins Dosing History. Their doses were then gradually tapered during their detention. Defs.' Resp. to PSOF ¶¶ 26, 32, 39; Rogers Dosing History; Hill Dosing History; Hollins Dosing History. And while tapering, the named Plaintiffs experienced withdrawal symptoms. Defs.' Resp. to PSOF ¶¶ 27, 33, 40; R. 302, Pls.' Exh. 18, Rogers Dep. at 48:8–14; R. 302, Pls.' Exh. 19, Hollins Dep. at 59:7–60:8; R. 302, Pls.' Exh. 20, Hill Dep. at 32:8–33:24.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011),

6

and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. So when the Court evaluates the Defendants' summary judgment motion, the Plaintiffs get the benefit of reasonable inferences; conversely, when evaluating the Plaintiffs' motion, the Court gives the Defendants the benefit of the doubt. *See Tompkins v. Cent. Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013).

### III. Analysis

### A. Class Claims

The parties cross-move for summary judgment on the class claims. Defs.' Mot.; Defs.' Br. at 2–13; Pls.' Mot. Post-sentencing prisoners' rights are governed by the Eighth Amendment (as incorporated against state and local governments through the Fourteenth Amendment), whereas pretrial detainees' rights are governed by the Due Process Clause of the Fourteenth Amendment. *See Miranda v. County of Lake*, 900

F.3d 335, 350–52 (7th Cir. 2018); *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). Because the legal standard differs for the two subclasses, *see id.*, the Court addresses their constitutional claims separately. The Court then addresses the parties' arguments about whether the Sheriff is a proper defendant and other miscellaneous class issues.

### 1. Post-Sentencing Prisoners

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021). "To prevail on an Eighth Amendment claim for inadequate medical care, a prisoner must show that a prison official acted with deliberate indifference to the prisoner's objectively serious medical need." *Id.* at 234–35. The Defendants agree that OUD is an objectively serious medical need. *See* R. 307, Defs.' Reply Br. at 8. So the only question is whether the tapering policy constituted deliberate indifference to prisoners' OUD.

Deliberate indifference requires subjective knowledge, that is, the Defendants must have actually "know[n] of and disregard[ed] an excessive risk to inmate health" from the tapering policy. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[A] plaintiff does not need to show that the official intended harm or believed that harm would occur." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). But it is insufficient to show that the Defendants were merely negligent, or even objectively reckless. *Id.* ("[O]bjective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim."

8

(emphasis in original)); *see also Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) ("Ordinary malpractice does not rise to the level of an Eighth Amendment claim.").

"Of course, [defendants] rarely admit that they deliberately opted against the best course of treatment." *Dean*, 18 F.4th at 241. So plaintiffs usually show deliberate indifference through circumstantial evidence. *Petties*, 836 F.3d at 728. "[A] jury can infer deliberate indifference when a treatment decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Dean*, 18 F.4th at 241 (cleaned up).[4] "By contrast, evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729 (emphasis in original).

### a. Substantial Risk of Harm

The parties first dispute whether the tapering policy caused a substantial risk of harm to prisoners. *See* Defs.' Br. at 2–5; R. 301, Pls.' Br. at 15–19, 24–25. The Plaintiffs introduce extensive evidence from experts that tapering falls below the medical standard of care for patients who have been taking regular doses of opioid antagonists. *See* PSOF ¶¶ 5, 9; Mangat Rep. at 3–5; Fatoki Rep. at 4–5; Fatoki Dep. at 106:9–23. Tapering triggers withdrawal symptoms and increases the risk of relapse and overdose. PSOF ¶¶ 3–4, 6–8, 10; Mangat Rep. at 2–3; Fatoki Rep. at 1–2.

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Instead, the standard of care is to maintain patients on their medication. *See* PSOF ¶¶ 5, 9; Mangat Rep. at 3–5; Fatoki Rep. at 4–5; Fatoki Dep. at 106:9–23.

The Defendants do not seriously dispute the effects and risks of tapering,[5] but they argue that tapering is nonetheless an appropriate treatment option. *See* Defs.' Br. at 2–5. They note that the Jail offered exceptions and other treatment to alleviate the harms of tapering. *Id.* at 3–4. For instance, the rate of tapering was individually determined for each prisoner by a physician, and could be slowed or paused if needed. DSOF ¶¶ 31–33; 2012 Tapering Policy at 5. Jail physicians could also seek waivers to exempt prisoners from tapering if needed. DSOF ¶ 36; 2012 Tapering Policy at 6. And prisoners received non-opioid-antagonist medications to treat withdrawal symptoms while tapering. DSOF ¶ 33; 2012 Tapering Policy at 3.

But these facts do not directly rebut the Plaintiffs' experts' testimony—or at least a jury could reasonably so find. *See* Pls.' Br. at 15–16, 18–19. The fact that the Jail offers some solutions to mitigate tapering's harms does not disprove that tapering causes "undue harm and suffering, while placing [prisoners] at an increased risk of relapse, overdose, and death." PSOF ¶ 3; Mangat Rep. at 1. Indeed, the Defendants for some reason offered no admissible medical evidence that tapering is an

---

[5]The Defendants note that not all individuals subjected to tapering experience withdrawal symptoms. Defs.' Reply Br. at 8; Defs.' Resp. to PSOF ¶ 3; Fatoki Dep. at 103:12–14. And sometimes withdrawal symptoms are mild. Defs.' Resp. to PSOF ¶ 3; Fatoki Dep. at 41:11–13. But the existence of exceptions does not genuinely dispute the Plaintiffs' evidence that, in general, tapering creates significant and unnecessary risks of withdrawal symptoms. And the Defendants do not raise any evidence to dispute the fact that tapering also increases the risk of relapse and overdose. PSOF ¶¶ 3–4; Mangat Rep. at 2–3. At most, these are disputes of fact that a jury must resolve.

appropriate treatment option.[6] They refer only to limited excerpts from the testimony of the *Plaintiffs'* experts, who clearly and repeatedly opine that tapering fails to meet the standard of care for OUD. *See* Pls.' Resp. to DSOF ¶ 18; Fatoki Dep. at 101:5–13. The Plaintiffs thus present evidence that could lead a reasonable jury to find that the tapering policy was so far afield from accepted medical standards that it created a substantial risk of harm to prisoners. *See Petties*, 836 F.3d at 728–31.

Still, the Defendants provide some evidence that the Jail provided better treatment than other correctional institutions, most of which immediately cut non-pregnant prisoners off their opioid antagonists. DSOF ¶¶ 19, 22; Fatoki Dep. at 124:21–24, 128:9–19; Mangat Dep. at 70:19–71:12. Dr. Adeyemi Fatoki, one of the Plaintiffs' expert witnesses, testified that no other correctional facilities in Illinois—and only around 5% of facilities across the entire country—offered any opioid antagonists to non-pregnant prisoners during the class period. DSOF ¶¶ 19, 22; Fatoki Dep. at 124:21–24, 128:9–19. It is undisputed that tapering causes less severe withdrawal symptoms than going cold turkey. Pls.' Resp. to DSOF ¶¶ 54–55; Mangat Dep. at 72:16–73:5; Fatoki Dep. at 164:5–13. Because most other correctional institutions did not offer even tapering to non-pregnant prisoners, a jury might very well find that the Jail's tapering policy was not "a substantial departure from accepted professional

---

[6]Defendants cite publications to support their contention that tapering is a widely-accepted practice, Defs.' Br. at 4 n.1; Defs.' Reply Br. at 7, but they do not explain why this evidence is not hearsay. The Court thus does not consider it. *See* Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2).

judgment," but within "the permissible bounds of competent medical judgment." *Petties*, 836 F.3d at 729 (cleaned up).

The Plaintiffs argue that evidence about treatment at other correctional facilities is immaterial because medical standards of care do not set a constitutional standard. Pls.' Br. at 11, 13, 17–18 (citing *Thompson v. City of Chicago*, 472 F.3d 444, 453–55 (7th Cir. 2006)). It is true that the evidence would not be dispositive, but the evidence is certainly relevant to what level of care the Eighth Amendment requires. *See Petties*, 836 F.3d at 728 (describing how "a doctor's failure to conform to basic standards of care" can be evidence of deliberate indifference); *see also Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020) (explaining how expert guidelines for medical care in correctional facilities are relevant for constitutional claims). In any event, the Plaintiffs' experts also opine on the standard of care for OUD, so the Court finds the evidence (from both sides) to be material. *See* Pls.' Br. at 25; PSOF ¶¶ 5, 9; Mangat Rep. at 3–5; Fatoki Rep. at 4–5; Fatoki Dep. at 106:9–23.

The Plaintiffs also contend that this testimony is inadmissible, and thus cannot support the Defendants' motion for summary judgment, because it is outside the expert witnesses' personal knowledge. Pls.' Br. at 10; *see* Fed. R. Civ. P. 56(c)(2). But expert witnesses can rely on and discuss facts that experts in their field would reasonably rely on to form their opinions. Fed. R. Evid. 703. The Plaintiffs' witnesses are experts in OUD treatment in correctional facilities, so they would reasonably rely on facts like the frequency of correctional facilities that provide opioid antagonists to

12

non-pregnant prisoners. Their testimony is thus admissible. *See Reed v. Ford Motor Co.*, 679 F. Supp. 873, 875 (S.D. Ind. 1988).

Having said that, the Defendants' evidence on this point is less than solid: the defense cites vague estimates from the Plaintiffs' experts, rather than presenting independent data about the prevalence of opioid antagonists in correctional facilities. *See* DSOF ¶¶ 19, 22; Fatoki Dep. at 124:21–24, 128:9–19; Mangat Dep. at 70:19–71:12. But because those estimates are admissible, and the Plaintiffs do not present any evidence to dispute them, they are enough to raise an issue of fact.

Finally, the Defendants also note that the tapering policy was reviewed and approved by multiple federal and state bodies. DSOF ¶¶ 25–27, 61; Mangat Dep. at 42:8–16, 49:7–10; Richardson Dep. at 57:23–58:4. The Plaintiffs argue again that this evidence is immaterial because the standards for accreditation and licensing are not the same as the constitutional standard of care for prisoners. Pls.' Br. at 14–15. But again, while not dispositive, the fact that multiple governing bodies authorized the Jail's tapering policy could lead a jury to conclude that it did not create an unconstitutional risk of harm to prisoners. *See Petties*, 836 F.3d at 729 (describing how "existing protocol" and "published requirements for health care do not create constitutional rights," but can provide circumstantial evidence for an Eighth Amendment claim).

In sum, both parties present evidence that raise competing inferences about the risk of harm created by the tapering policy. There is thus a genuine dispute of fact on this issue.

13

### b. Subjective Knowledge

The Defendants argue that they were unaware of tapering's risks because, compared to other correctional facilities, they believed they were providing cutting-edge care to prisoners with OUD. Defs.' Br. at 5–6. But the Plaintiffs' experts say that it is long-established in the medical community that tapering falls below the standard of care, PSOF ¶¶ 5, 9; Mangat Rep. at 3–5; Fatoki Rep. at 4–5; Fatoki Dep. at 106:9–23, which could lead a jury to conclude that the Defendants actually knew the tapering policy created a substantial risk of harm to prisoners. *See Petties*, 836 F.3d at 732–33. So there is a dispute of fact as to the Defendants' actual knowledge.

What's more, a prior suit against the Defendants may also have made them aware of the risk of harm from tapering. Pls.' Br. at 25–27. In *Parish v. Sheriff of Cook County*, 2019 WL 2297464 (N.D. Ill. May 30, 2019), a class of pretrial detainees at the Cook County Jail sued the Sheriff and the County based on inadequate medical care, including the methadone tapering policy. *Id.* at *1. The *Parish* plaintiffs produced expert reports that concluded the tapering policy caused gratuitous physical pain, psychological discomfort, and increased risk of overdose. PSOF ¶¶ 22–23; R. 303, Pls.' Exh. 37, King Rep. at 7; R. 303, Pls.' Exh. 38, Stewart Rep. at 3. These reports were produced and discussed in depositions for the *Parish* suit in 2011 and 2012. King Rep. at 1; Stewart Rep. at 1.

The Plaintiffs do not produce evidence that the Defendants' policymakers and employees actually read the *Parish* reports. At trial, the Plaintiffs will have to prove that the Defendants had actual knowledge of the reports. But the Defendants do not

14

argue that they were unaware of the reports. *See* Defs.' Reply Br. at 11–12. And it is a common-sense inference that the Defendants were aware of key evidence presented against them in the *Parish* lawsuit. The reports thus raise an inference that by 2013—the beginning of the class period—the Defendants were actually aware that the tapering policy created a significant risk of harm to people detained or imprisoned at Cook County Jail. *See Daniel v. Cook County*, 833 F.3d 728, 735–36 (7th Cir. 2016).

The Defendants' arguments to the contrary fall short. The defense argues that the reports are inadmissible because they were generated for a different case covering a different time period, and the witnesses were not disclosed as experts under Civil Rule 26(a)(2). Defs.' Reply Br. at 25. But there is no reason to think that the expert opinions changed over the time periods, and the reports were disclosed in the *Parish* litigation with plentiful opportunity to examine them. The Defendants point out that the tapering policy was not the focus of the *Parish* lawsuit, which challenged other aspects of the Jail's medical care. Defs.' Reply Br. at 12. But the *Parish* plaintiffs also challenged the tapering policy, giving the Defendants notice of its harm. Lastly, the Defendants contend that the suit did not put them on notice because there was no final decision holding that the tapering policy was unconstitutional (the *Parish* suit settled). *Id.* at 11. But the expert reports need not be dispositive; their conclusions that the tapering policy fell below the standard of care gave adequate notice to the Defendants that the policy created substantial risk of harm to prisoners. *See Daniel*, 833 F.3d at 735–36.

15

Because there are many disputed facts material to deliberate indifference, summary judgment for either side is not warranted. A jury must weigh the competing evidence and assess the post-sentencing prisoners' Eighth Amendment class claim. The Court denies the parties' cross-motions for summary judgment on the Eighth Amendment claim.

## 2. Pretrial Detainees

Unlike post-sentencing prisoners, pretrial detainees bringing a due process claim need not show that Defendants were subjectively aware of the risk from the tapering policy. *Miranda*, 900 F.3d at 351–52. Instead, "[c]laims of inadequate medical care while in pretrial detention are subject to an objective-reasonableness standard." *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). The Plaintiffs must show: (1) that the Defendants acted "purposefully, knowingly, or recklessly," and (2) "that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *Id.* Here, there is no question that the Defendants purposefully enforced the tapering policy. Thus, the Defendants argue only that the policy was not objectively unreasonable. *See* Defs.' Br. at 7–10.

The parties make the same arguments that they raised to dispute whether tapering caused a substantial risk of harm to detainees under the Eighth Amendment claims. *See* Defs.' Br. at 7–9; Pls.' Br. at 25, 29–31. So for the reasons just explained, the parties raise genuine disputes of fact about whether the tapering policy was objectively unreasonable.

16

One additional factor matters: the Court "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley v. Hendrickson*, 576 U.S. 389, 399–400 (2015). The Defendants' tapering policy is thus objectively unreasonable if it "is not rationally related to a legitimate governmental objective or … it is excessive in relation to that purpose." *Id.* at 398.

Here, the Defendants posit that several legitimate penological interests prevented them from providing regular doses of methadone to detainees. Defs.' Br. at 9. The Defendants say that they had to limit the quantity of methadone in the Jail to mitigate diversion risks. *Id.* And the size of the OTP had to remain small because it was costly to maintain the staff and secure locations needed to administer the methadone. *Id.* The Defendants argue that tapering—which requires less methadone per detainee—was necessary to address these legitimate concerns. *Id.*

The Defendants identify two pieces of evidence that show these proffered interests. First, they point to testimony from the Plaintiffs' experts about the general challenges that correctional facilities face when providing opioid antagonists to detainees. *See* DSOF ¶¶ 20–21; Mangat Dep. at 70:1–18; Fatoki Dep. at 97:4–98:1. Second, they cite publications about diversion risks from methadone. Defs.' Reply Br. at 5.

As an initial matter, the Plaintiffs argue that this evidence is inadmissible. The Plaintiffs are part right and part wrong. First, the Plaintiffs contend that the

expert testimony is inadmissible because it is outside the witnesses' personal knowledge. Pls.' Br. at 10; R. 317, Pls.' Reply Br. at 14–15. But as described earlier in this Opinion, the Plaintiffs themselves qualified these witnesses as experts in OUD treatment in correctional facilities. The experts can thus opine on challenges to providing such treatment. *See* Fed. R. Evid. 703; *Reed*, 679 F. Supp. at 875.

Second, the Plaintiffs argue that the publications are inadmissible hearsay. Pls.' Reply Br. at 15. Here, the Court agrees. The Defendants offer no basis for citing these publications for the truth of their contents. Perhaps they could have relied on the learned-treatise exception. *See* Fed. R. Evid. 803(18) (permitting admission of a "statement contained in a treatise, periodical, or pamphlet if … [it] is called to the attention of an expert witness on cross-examination" and "established as a reliable authority by the expert's admission or testimony"). But the Defendants elicited no testimony in Plaintiffs' experts' depositions to establish the reliability of these publications. And the Court is skeptical that the Defendants could elicit such testimony on cross-examination of the Plaintiffs' experts at trial. Thus, the Court does not consider these publications at summary judgment. *See* Fed. R. Civ. P. 56(c)(2).

The Plaintiffs' experts' testimony, standing alone, provides weak evidence for the Defendants. The Court would have expected the Defendants to ask their own experts to opine on these challenges. Because the Defendants rely on the Plaintiffs' expert witnesses, the testimony is not specific to Cook County Jail. What's more, the Defendants provide no concrete facts about the security and cost issues. For example, how much more does it cost to provide regular doses of methadone to detainees versus

18

taper them off? What quantity of additional methadone is required to maintain doses versus taper? Because Defendants produce no specific answers to those questions, it is possible that providing regular doses of methadone requires only minor increases in quantity and cost. Based on the dearth of evidence, a reasonable jury could find that the tapering policy is not rationally related to any legitimate penological objectives, or is at least excessive to those objectives. *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 856–58 (7th Cir. 2017) (reversing a grant of summary judgment to defendants where they presented weak evidence of security justifications underlying a jail policy).

Still, the Plaintiffs' experts opined generally on challenges to providing methadone in correctional settings, and there is no reason to think that these challenges do not exist in the Cook County Jail. And it is common sense that providing regular doses of methadone would require greater quantities of the medication, creating increased security risks and cost. Indeed, the Defendants present evidence that the Jail eliminated the mandatory tapering policy in 2017 when it received additional funding, which supports the inference that cost was a legitimate reason for the tapering policy. DSOF ¶ 37; Richardson Dep. at 38:20–39:7. The Defendants thus present just enough evidence to raise a genuine issue as to whether the tapering policy was rationally related to, and not in excess to, legitimate penological challenges.

The Plaintiffs also argue that deposition testimony in the *Parish* suit from Dr. Avery Hart, then-Chief Medical Officer of the Jail, rebuts the Defendants' proffered interests. Pls.' Br. at 27. Dr. Hart testified that it was not the County's goal or mission

19

"to run a methadone maintenance program." PSOF ¶ 18; R. 303, Pls.' Exh. 35, Hart Dep. at 10:19–11:10.[7] The Plaintiffs seem to argue that this testimony shows that the Defendants implemented the tapering policy not for any legitimate penological reasons, but because they simply did not want to provide regular doses of methadone to detainees. Pls.' Br. at 27. This is weak evidence, but it further suggests that there are genuine disputes of fact that a jury must resolve.

Ultimately, then, a jury should weigh whether the Defendants had legitimate security and penological interests, or whether the tapering policy was excessive in relation to those interests. *See Mulvania*, 850 F.3d at 856–58 (7th Cir. 2017). So the Court denies the parties' cross-motions for summary judgment on the Fourteenth Amendment claim.

As a final note, the Defendants argue that if tapering is unconstitutional, then almost every correctional institution in the country committed constitutional violations during the class period. Defs.' Br. at 12–13. But as explained throughout this Opinion, the Defendants have repeatedly missed opportunities to introduce admissible expert evidence to prove basic facts. No doubt other correctional institutions would litigate similar suits differently. On a different record, other institutions might very well prevail at summary judgment. So the denial of summary judgment on the class claims here does not necessarily open the floodgates for suits against

---

[7]It is unclear whether the Plaintiffs disclosed Dr. Hart's deposition during discovery and how his testimony would be admissible at trial (e.g., whether the Plaintiffs would call Dr. Hart as a witness). But because the Defendants do not raise these issues, the Court leaves them for a potential motion in limine or for pretrial conference.

correctional facilities that did not offer regular doses of methadone to non-pregnant detainees or prisoners with OUD.

### 3. Sheriff of Cook County

The Defendants say that even if the tapering policy violates the Eighth Amendment, the Sheriff is not a proper defendant because *Cook County* ran the Jail's OTP, and he relied on the County's medical professionals to determine the appropriate treatment policy. Defs.' Br. at 10–11; Defs.' Reply Br. at 12. The Defendants cite personal-liability cases holding that, generally speaking, correctional officials are not deliberately indifferent when they defer to the judgment of medical professionals. Defs.' Br. at 10–11 (citing *McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022)); Defs.' Reply Br. at 12 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006)). But those cases do not apply here. The Plaintiffs advanced a *Monell* claim against the Sheriff's Office, not a personal-liability claim, so the Plaintiffs need not show that the Sheriff himself was deliberately indifferent.

Instead, the Plaintiffs must show that the Sheriff's Office (1) had a policy or practice, (2) that demonstrates deliberate indifference, and (3) was the "moving force" behind the constitutional violation. *Dean*, 18 F.4th at 235. The second factor is disputed, as described earlier in this Opinion, which is why the Court denies both parties' summary judgment motions. But the Plaintiffs clearly have proven the other two factors: the Jail had an express tapering policy, and that policy was the moving force behind any alleged constitutional violation arising from the forced tapering of detainees off methadone. *See* DSOF ¶ 31; 2012 Tapering Policy at 1, 4.

21

To the extent that the Defendants contend that the tapering policy should not be attributed to the Sheriff because the County made the policy, this argument also fails. The Defendants cite cases that describe how the County operates Cermak Health Services, an extension of Cook County Hospital that provides medical care to the Jail's detainees. Defs.' Br. at 10–11 (first citing *Winfield v. Dart*, 2014 WL 983137, at \*1 (N.D. Ill. Mar. 13, 2014); and then citing *Boyce v. Moore*, 314 F.3d 884, 887 n.1 (7th Cir. 2002)). The Plaintiffs respond that the Sheriff, as custodian of the Jail, is responsible for providing adequate medical care to detainees. Pls.' Br. at 22 (citing *Daniel*, 833 F.3d at 737). But neither party cites a case that explains who is legally responsible for medical policies in the Jail. And neither party presents evidence showing which municipal entity—the Sheriff's Office, Cook County, or both—actually set the tapering policy. Absent specific evidence that the Sheriff was *not* involved in the tapering policy, the Court declines to grant summary judgment to the Sheriff on this basis. The Defendant's motion as to the Sheriff is denied.[8]

### 4. Miscellaneous Class Issues

The parties also raise a few miscellaneous issues related to the class definition and class representatives. First, based on data obtained in discovery, the Plaintiffs determined that some of the post-sentencing prisoners during the class period were detained at the Jail on alleged probation violations. Pls.' Br. at 9 n.5. Unlike prisoners

---

[8]As a practical matter, whether the Sheriff is a named defendant makes little difference because Illinois law requires the County to pay any judgments against the Sheriff's office in an official capacity. *Carver v. Sheriff of LaSalle Cnty.*, 324 F.3d 947, 947–48 (7th Cir. 2003).

serving misdemeanor sentences, who spend their entire sentence at the Jail, these post-sentencing prisoners were subsequently transferred to the Illinois Department of Corrections (which does not provide opioid antagonists to prisoners). *Id.* Because these two groups of prisoners are meaningfully different, the Plaintiffs ask the Court to redefine the subclass of post-sentencing prisoners to exclude prisoners in the Jail on a petition for violation of probation. *Id.* The Defendants do not object. Defs.' Reply Br. at 22 n.2. The Court thus grants the request. The subclass is now defined as:

> all post-sentencing prisoners who (1) entered the Cook County Jail between December 23, 2013 and July 1, 2017, inclusive and (2) opted out of, or are otherwise excluded from, participation in *Parish v. Sheriff*, 07-cv-4369; and were, at the time of entry into the Jail, lawfully taking an opioid antagonist, as defined in 42 C.F.R. 8.12(h)(2), who were not then on parole or held on a warrant from another jurisdiction or in custody on a petition for violation of probation, who were not pregnant, and who received more than one dose of methadone while detained.

*See* Pls.' Br. at 9 n.5.

Second, the Defendants request that the Court limit the class to individuals who were taking methadone before entering the Jail (as opposed to another opioid antagonist). Defs.' Reply Br. at 22 n.2. The Defendants make this request in a footnote with little explanation, and the Plaintiffs do not respond or stipulate to limit the class definition in this way. The Defendants' request appears to be based on the Plaintiffs' objections to two of the Defendants' statement of facts, in which the Plaintiffs puzzlingly contend that other opioid antagonists—Naltrexone and Buprenorphine—are not relevant to this suit. *See* Pls.' Resp. to DSOF ¶¶ 10–11. But there is no evidence that methadone was the only opioid antagonist that detainees were taking before

23

they entered the Jail and enrolled in the OTP. *See* DSOF ¶ 9; Mangat Dep. at 60:5–11. The request is thus denied. If the Defendants still wish to limit the class to individuals taking methadone before entering the Jail, they can re-raise this request and clarify its basis.

Third, the Defendants point out that class representative Hollins was detained at the Cook County Jail from September 12, 2013, to October 5, 2013, which is outside the class period. Defs.' Reply Br. at 13–14. The Plaintiffs do not dispute this fact. *See* Pls.' Resp. to DSOF ¶ 69; R. 138, County Answer ¶ 25. They instead argue that the Defendants waived this issue by failing to raise it in their opening summary-judgment brief. Pls.' Reply Br. at 21. But it is Hollins's burden to prove that she is a class member, *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977); *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019), so this issue cannot be waived at summary judgment. The Plaintiffs also argue that the *Parish* suit tolled the statute of limitations, Pls.' Reply Br. at 22, but this is not a statute-of-limitations issue. Because Hollins was undisputably detained outside the class period, partial summary judgment is granted to the Defendants against Hollins on the class claim.

### B. Individual Claims

The Defendants also move for summary judgment on the named Plaintiffs' individual ADA, Rehabilitation Act, and constitutional claims based on the delay in their first methadone dose. Defs.' Br. at 13–15. The Court first addresses the ADA and Rehabilitation Act claims, then the individual constitutional claims.

### 1. ADA and Rehabilitation Act

The three named Plaintiffs bring individual claims for violations of the ADA and Rehabilitation Act. Second Am. Compl. ¶¶ 36–41. Both statutes prohibit disability discrimination against individuals in the programs or activities of public entities or entities receiving federal funds, respectively. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Because relief available under the ADA and Rehabilitation Act is coextensive, "[c]ourts construe and apply the statutes in a consistent manner." *McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024) (cleaned up). To overcome the Defendants' summary-judgment motion on either claim, the named plaintiffs must offer evidence that (1) they are a qualified person, (2) with a disability, and (3) the Jail denied them access to a program or activity because of their disability. *Id.* The Defendants dispute only the last element. Defs.' Br. at 13–15. A plaintiff may satisfy the last element by showing either that "she was intentionally discriminated against or that the defendant failed to afford her a reasonable accommodation for her disability." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019). The named Plaintiffs' theory of disability discrimination is unclear, so the Court addresses both.

First, the Defendants argue that there is no evidence that the Jail tapered the individual plaintiffs' methadone dosage *because of* their OUD. Defs.' Br. at 13–15. Instead, the Jail used tapering because it believed that it was an appropriate treatment option. *Id.* Although the Plaintiffs provide significant evidence to dispute this view, *see supra* Section III.A, they offer no evidence that Defendants' actions were motivated by discriminatory bias or based on irrelevant criteria that would suggest

25

discriminatory intent, *see Reed*, 915 F.3d at 486 n.6 (describing how the ADA and Rehabilitation Act "do not create a remedy for medical malpractice" so it is not unlawful when "a health care provider makes a discriminating professional judgment about the type of treatment to provide to a patient); *see also Williams v. Ill. Dep't of Corr.*, 2023 WL 1472246, at *29–30 (S.D. Ill. Feb. 2, 2023). The individual plaintiffs' intentional-discrimination claims thus fail at summary judgment.

Second, the Defendants argue that providing regular doses of methadone to detainees is not a necessary reasonable accommodation. Defs.' Reply Br. at 15. "It is well established that refusing to make reasonable accommodations is tantamount to denying access" to programs and activities, and in prison, "qualifying programs and activities include … medical care." *McDaniel*, 115 F.4th at 823 (cleaned up). But "prison officials are not required to provide a prisoner with disabilities the particular accommodations he requests or prefers." *Id.* "Rather, the defendant need only provide some reasonable accommodation that ensures that the person with disabilities has equal access to the benefits of programs or activities." *Id.* (cleaned up). Whether a requested accommodation is reasonable is a "highly fact-specific inquiry." *Id.* (cleaned up).

Here, there is a genuine dispute of fact over whether the tapering program was a required reasonable accommodation for the individual Plaintiffs' OUD. As described earlier in this Opinion, the Plaintiffs present evidence that could lead a reasonable jury to conclude that tapering was per se inadequate to treat their OUD and regular doses of methadone were required. *See supra* Section III.A. But the Defendants

26

present evidence that the requested accommodation would require more funds, staffing, and security, which might lead a jury to conclude the accommodation was unreasonable. *See supra* Section III.A.2; *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) ("An accommodation is unreasonable if it imposes undue financial or administrative burdens …."). Because there are genuine disputes of fact about the adequacy of tapering and the reasonability of the Plaintiffs' requested accommodation, summary judgment is inappropriate.

### 2. Individual Delay

Rogers and Hollins also bring individual constitutional claims based on the delay in receiving their initial dose of methadone at the Jail. Second Am. Compl. ¶¶ 29–35; Pls.' Br. at 2. Both waited over five days to receive their first dose. Defs.' Resp. to PSOF ¶¶ 25–26, 36, 39; Rogers Methadone Referral Form (intake on January 20, 2014); Rogers Dosing History (first dose on January 26, 2014); Hollins Methadone Referral Form (entered Jail on September 12, 2013); R. 302, Pls.' Exh. 8, Hollins Prescription Order (first dose ordered on September 21, 2013). Rogers brings an Eighth Amendment claim because he was serving a misdemeanor sentence at the Jail; Hollins brings a Fourteenth Amendment claim because she was a pretrial detainee. PSOF ¶¶ 25, 37; R. 303, Pls.' Exh. 24, Rogers Case Summary at 2; R. 303, Pls.' Exh. 31, Hollins Case Summary at 3.

The Plaintiffs first contend that the Defendants cannot seek summary judgment on the delay claims because the Defendants failed to address them in their opening summary-judgment brief. Pls.' Br. at 2 n.1; Pls.' Reply Br. at 18. It is true

27

that, in the opening brief, the Defendants did not devote significant space to the delay claims. But they did argue that the Plaintiffs could not make a *Monell* claim based on the delay, *see* Defs.' Br. at 14, which is adequate to raise the issue.

As a reminder, to raise a *Monell* claim, Rogers and Hollins must trace their alleged constitutional deprivations to some municipal action, such as "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean*, 18 F.4th at 235 (cleaned up). They must also show that "the policy or custom demonstrates municipal fault"—meaning that it demonstrates deliberate indifference (for an Eighth Amendment claim) or was objectively unreasonable (for a Fourteenth Amendment claim). *Id.* (cleaned up). And finally, the plaintiffs "must show that the municipal action was the moving force behind the federal-rights violation." *Id.* (cleaned up).

Here, the individual Plaintiffs contend that the Defendants had a widespread custom or practice of delaying the first methadone dose to detainees. Second Am. Compl. ¶ 29. But they offer no evidence to support this claim. *See generally* Pls.' Reply Br. at 18. For instance, they do not identify any data that shows repeated or widespread delays in the first doses of methadone given to detainees. What's more, they do not produce evidence that any delays that did occur were objectively unreasonable or due to deliberate indifference. Because Rogers and Hollins fail to raise any

evidence that supports a *Monell* claim based on delays in their initial methadone dose, summary judgment is granted to the Defendants on these claims.

## IV. Conclusion

The parties' cross-motions for summary judgment on the class claims, R. 274; R. 283, are denied (except as to plaintiff Hollins; partial summary judgment is entered in the Defendants' favor on her class claim). The Defendants' motion for summary judgment on the named Plaintiffs' individual ADA and Rehabilitation Act claims, R. 274, is denied. But the Defendants' motion for summary judgment on the individual constitutional claims, R. 274, is granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2026